# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 15, 2011 Session

## STATE OF TENNESSEE v. JOHNNY COFFEY

**Appeal from the Circuit Court for Bradley County**
**No. M-08-597     Carroll L. Ross, Judge**

_____

**No. E2011-00192-CCA-R3-CD - Filed February 6, 2012**

_____

The defendant, Johnny Coffey, appeals his Bradley County Circuit Court jury conviction of second degree murder, claiming that the trial court erred by denying him funds to procure additional expert assistance, by denying his request to play witness statements in their entireties, by refusing to grant his motion for a mistrial, by denying his request for a jury instruction on self-defense, and by failing to apply certain mitigating factors to reduce his sentence. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Matthew C. Rogers and Randy Rogers, Athens, Tennessee, for the appellant, Johnny Coffey.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; R. Steven Bebb, District Attorney General; and Aubrey Wayne Carter and Cynthia Lecroy-Schemel, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The defendant's conviction relates to the stabbing death of the victim, Jesse Schoate, on September 27, 2008. On that date, William Burrell and some others organized a 30th birthday party for Misty Thompson to be held in a vacant field. Ms. Thompson testified at trial that Mr. Burrell had selected the location, procured a keg of beer, and hired a band for the evening's entertainment. Guests were invited via flyer or handbill to bring tents to camp overnight. Ms. Thompson said that she arrived for the party at approximately 6:00 p.m. to help set up and that Mr. Burrell was mowing the area. She met the defendant

for the first time when he offered to help her set up her tent, and she accepted his help. As they worked, the defendant asked her, "Who's the lucky man tonight?" She told him, "No one," and she explained that it was her birthday and that she intended to "have fun." When the defendant remarked that he might be sleeping with her, she told him, "No." She explained that the defendant "wasn't really too aggressive" when he made the comment. At that point, Autumn Cooper arrived with the victim. Shortly thereafter, others arrived, and the party began in earnest.

Ms. Thompson said that she and the others were drinking beer and that the victim primarily stayed seated next to the campfire. She stated that she did not pay any particular attention to the defendant during the party because she "didn't know him." She recalled that she became sleepy "probably around 12 o'clock" and went to her tent. Ms. Thompson testified that she "passed out" as soon as she got into her tent and that the next thing she remembered was "[a] cop crawling in [her] tent waking [her] up." She did not witness any altercation between the defendant and the victim.

Karen Jackson Vetten testified that she knew the defendant as a friend of Mr. Burrell. She and her husband attended Ms. Thompson's party on September 27, 2008, arriving at approximately 9:15 p.m. She said that at one point during the evening, her husband and Mr. Burrell asked the defendant to leave the party because of his behavior. Ms. Vetten explained that the defendant had "grabbed [her] butt" and had gotten into the background of several photographs "making sure he was known" by "obscene" gestures. She said that she "got in between them and pushed them apart" after the men started bickering. She and her husband then walked away, and the defendant followed them "dragging his leg" and asking her to "help him." She said she started to help the defendant but her husband would not allow it. She and her husband left the party at "[a]round 11:15 or 11:30."

Cassie Brown, Mr. Burrell's girlfriend at the time of the murder, helped Mr. Burrell plan Ms. Thompson's party. While helping Mr. Burrell set up for the party, Ms. Brown realized they needed some items, so she went to the store. When she returned, the defendant was there, which she thought odd because the defendant had not been invited to the party. Later that evening, she and the defendant were sitting around the campfire drinking beer when they saw "headlights coming over the hill" toward the party. The defendant told Ms. Brown "that he didn't know who it was, but he was gonna go get a shotgun out of his truck." She said she told him to "shut up." The defendant remained beside the fire.

When the band finished playing at midnight, people began to leave, and Ms. Brown "climbed into the van and went to sleep." At approximately 2:00 a.m., "[t]here was a lot of screaming and banging on the van door." When she opened the van door, Ms. Brown

saw the victim "laying on the ground" and the defendant "on the other side of" the fire "with a knife in his hand, just covered in blood." Ms. Brown testified that she "[a]utomatically" wrapped the victim in a blanket and began cardiopulmonary resuscitation ("CPR"). She said that the victim "had a large gash underneath his left arm," and Ms. Cooper and the defendant were trying to get the victim into the van. Then she saw the defendant pull the victim's feet so that they could not actually get the victim into the van. She said that she never saw the defendant attempt to render aid to the victim.

Autumn Cooper testified that she and the victim, who were dating at the time, attended Ms. Thompson's birthday party together. She met the defendant for the first time when she arrived for the party and saw him with Mr. Burrell. Ms. Cooper said that later that evening, she saw the defendant with his hands inside Ms. Thompson's tent "feeling around on her legs." When Ms. Cooper asked the defendant what he was doing, he said, "She's unconscious. . . . she's dying." Ms. Cooper ordered the defendant out of the tent and got into the tent with Ms. Thompson. She recalled that she stayed for 15 to 20 minutes talking with Ms. Thompson until Ms. Thompson fell asleep. After she left Ms. Thompson's tent, Ms. Cooper got some snacks for herself and the victim. She returned to the tent the couple was sharing, and they began to eat.

Ms. Cooper said that she and the victim ate for a few minutes and "pick[ed] at" one another before deciding to go to sleep. The victim went outside to urinate. Ms. Cooper said that she could hear the victim urinating and that she heard the defendant say, "You know you like it." The victim said, "I don't know what you're talking about, man," and the defendant said, "Why don't you come down to the campfire with me?" Ms. Cooper testified that the victim refused and told the defendant to "go to bed and leave [them] alone" before zipping the tent. She recalled that the defendant then unzipped the tent, and the victim again told the defendant to leave and zipped the tent. At that point, the defendant stepped down onto the tent and onto Ms. Cooper's chest. She said that she and the victim tried to be quiet because they were unsure what the defendant might do next.

The defendant then began kicking and pulling the tent to the ground with Ms. Cooper and the victim inside. She said that they immediately began groping for the zipper. The victim found the zipper and started crawling out, with Ms. Cooper close behind him. Ms. Cooper said that when she emerged from the tent she saw the defendant and the victim on the ground. She testified that Mr. Burrell attempted to separate the men. Suddenly, the defendant looked at Ms. Cooper and said, "He's bleeding, he's bleeding." The defendant pulled the victim to his feet, and Ms. Cooper saw that he had been stabbed. Ms. Cooper said that she immediately began looking for her car keys so that she could take the victim to the hospital. She explained that cellular telephones would not work in the remote area. When she could not find her own keys, she decided to try to get the victim to the van where Ms.

Brown was sleeping. The defendant helped her carry him.

During cross-examination, Ms. Cooper admitted that she told officers that the victim "went after" the defendant when he emerged from the tent, but she explained that the victim "didn't even have time to stand up" before the defendant attacked him.

Bradley County Sheriff's Office ("BCSO") Officer James Bohannon testified that he responded to a 1:30 a.m. call of a stabbing at a location on Bradford Lane in Charleston. When he arrived, he encountered Mr. Burrell, who was bleeding from a cut on his hand and urging the officer to go to the victim in a nearby field. On his way, Officer Bohannon encountered the defendant "walking through the field" toward the scene and "covered in blood." The defendant did not speak to the officer but "pointed down the field to the direction of a white van" where another individual was performing CPR on the victim. Officer Bohannon took over CPR. As he performed CPR, the defendant walked up and sat down on the ground behind the officer and the victim. The defendant said "that he didn't mean to cut [the victim] so deep." At that point, Officer Bohannon briefly stopped CPR to handcuff the defendant.

The shirtless defendant had blood on his face, shoulders, and hair. When other officers arrived, the defendant told them that the murder weapon was in his pocket. Officer Bohannon took a small knife and a large knife from the defendant. The larger of the two weapons was covered in blood. He never saw the defendant attempt to aid the victim.

United States Secret Service Special Agent Joseph Lea testified that at the time of the murder he was working as a Detective with BCSO and that he acted as the primary investigator in the case. Detective Lea said that when he arrived on the scene, he observed the victim on the ground next to a white van. He recalled that a tent identified as belonging to the victim had been knocked to the ground, and witnesses said that the defendant had knocked it down. A trail of blood led from the tent to the victim's body. Detective Lea described the victim's injuries,

> He had a laceration about that long on his abdomen, another one
> long across his chest, another one that went the whole radius of
> his arm, and . . . another cut to his back around the same area,
> and I believe his ear was also cut, the top part of his ear.

Detective Lea testified that toxicology testing showed that the victim's blood was negative for the presence of narcotics and that his blood alcohol level was .18 percent. Testing also established that the defendant's blood alcohol level was .10 percent and that his blood tested positive for the presence of propoxyphene, norpropoxyphene, dihydrocodeinone,

and alprazolam. Forensic testing also established that the victim's blood was on the large knife confiscated from the defendant.

During cross-examination, Detective Lea conceded that the level of drugs in the defendant's system were within therapeutic limits. He also acknowledged that the location of the defendant's shirt at the crime scene was consistent with witness accounts that the defendant had attempted to use his shirt to stem the victim's bleeding. Finally, he acknowledged that Mr. Burrell told police that the defendant and the victim ran toward one another at the beginning of the altercation.

Knox County Medical Examiner Doctor Darinka Mileusnic-Polchan, who performed the autopsy of the victim, testified that the cause of the victim's death "was multiple sharp force injuries; specifically, multiple incised wounds" and explained that the victim suffered "very long wounds that are relatively shallow, but some of them go deep enough into the body to injure major vessels." The first of these wounds, a "very deep incised wound that was on the inside all the way high up on the right arm," traveled right to left and went "all the way to the bone, it completely sever[ed] the major artery, which is the brachial artery." Because the wound severed a major artery, "the main mechanism of death" was "severe blood loss." Doctor Mileusnic-Polchan said that the orientation of the wound established that the victim sustained the wound while his arm was "raised not halfway, but all the way up."

A second wound to the victim's left chest traveled "front to back, right to left, and down ward, and . . . toward the back of the body." Doctor Mileusnic-Polchan described "that particular wound" as "very, very deep," noting that the victim's "ribs are exposed." A third, similar wound to the victim's upper abdomen also traveled "front to back and kind of right to left" and was "very deep" and "very long." Doctor Mileusnic-Polchan testified that neither of the wounds to the front of the victim's body were life threatening but that the wound to the arm was life threatening "because of the involvement of the major vessels, the size of the vessels, the closeness to the heart, and the location. It's in an area that it's really hard to block the artery." The victim also suffered "two relatively superficial cuts" on his back and a superficial cut to his ear. In addition he had "a superficial abrasion" in the middle of his forehead and two "linear" blunt force trauma injuries on his neck.

During cross-examination, Doctor Mileusnic-Polchan testified that the wound inflicted to the victim's arm could not have occurred if the victim had the defendant in a headlock because "that would actually block [the affected area] more than really expose it." She conceded that the autopsy could not determine where the defendant and the victim were when the wounds were inflicted. Upon examining a photograph of the clothing worn by the defendant and the victim, however, she opined that the blood stains showed "that the victim

and the assailant are facing each other."

Following Doctor Mileusnic-Polchan's testimony, the State rested. In addition, the State dismissed the count of the indictment charging the defendant with the aggravated assault of Mr. Burrell.

The defendant offered the testimony of William Burrell. Mr. Burrell testified that he knew the defendant but "wouldn't call him a friend." Nevertheless, he invited the defendant to Ms. Thompson's party. He said that the defendant "kept causing problems" throughout the evening culminating in the victim's murder. He recalled that in the minutes leading up to the stabbing, he heard the victim's "begging [the defendant] to leave him alone" and the defendant's telling the victim to come to the campfire. He also saw the defendant "stomping and kicking" at the victim's tent as the victim tried to get out of it. Mr. Burrell said that he ran toward the defendant just before the victim exited the tent. He said that "no sooner than [the victim] came out of the tent, it was like [the victim and the defendant] fell straight down." He stated that he could not really tell what was happening, but he admitted that he told Detective Lea that it appeared that the victim "was beating Johnny up." He said that he tried to break up the fight, and the defendant "whacked off" his finger with a knife.

Doctor June Young, a Clinical Psychologist, testified that she evaluated the defendant and concluded "that he was competent to stand trial[] and that there was no support for insanity." She agreed that the defendant had been treated by a psychiatrist for "many years" and that he had had "[q]uite a few" mental hospitalizations. She said that she reviewed the records of the defendant's treating psychiatrist, Doctor Troy Gilson, and agreed that the defendant had been diagnosed with bipolar disorder. She did not review records of the defendant's hospitalization at Moccasin Bend for mental health issues, explaining that the hospitalization "was too far away from the time of the alleged crime to be relevant." Doctor Young explained that she only reviewed the defendant's records going back to 2007 because her "job was to determine his mental condition around the time of the crime, not for the past 15 years." She did review the records of his most recent admission to Peninsula Hospital. In addition to her review of the relevant records, Doctor Young met with the defendant for approximately 90 minutes. She agreed that the defendant continued to be affected by mental illness but concluded that the defendant's mental illness did not render him legally incompetent or insane. She emphasized, "My report does not say that he is not affected by mental illness. It simply states that his mental illness was not so severe as to interfere with his ability to appreciate the wrongfulness of his acts."

Doctor Young acknowledged that she did not speak directly with Doctor Gilson, explaining that she wanted to avoid a conflict of interest.

Renee Kimsey, who had previously maintained a romantic relationship with the defendant, testified that the defendant had "an unnatural fear" that he was being watched and that, on occasion, he "would talk to people that [she] didn't see." She recalled one specific occasion when she observed the defendant talking to "a teenage boy and a teenage girl" that were not really there. She said that the defendant had had several surgeries on his neck and his knees and that "[h]e's very protective of the areas that have been . . . injured prior." Specifically, she stated that the defendant was "very fearful that if someone hit him or injured him that he could become paralyzed or even that it would kill him." During the weeks just prior to the offense, the defendant called her and told her that he was "chasing [her] through the woods" when she was not even in the same county.

Pamela Lightfoot, the defendant's cousin, testified that she saw Mr. Burrell at the defendant's residence and that he showed her a flyer and invited her to Ms. Thompson's birthday party. When she declined the invitation, Mr. Burrell said, "Well, what do you think about [the defendant] being the bouncer?" The defendant told Mr. Burrell "that he wasn't gonna be a bouncer." At that point, Ms. Lightfoot "told them they w[ere] crazy" and left. On the following day, she again saw the defendant and Mr. Burrell together, and the pair were discussing the defendant's acting as a "bouncer" at Ms. Thompson's party. Mr. Burrell said, "Well, [the defendant's] got a gun permit. That's the reason I want [him] to do it." She told the defendant he would be "crazy" if he accepted the job.

The 41-year-old defendant testified that Mr. Burrell invited him to Ms. Thompson's birthday party and asked him to act as "a bouncer" because the defendant had both a handgun and a handgun carry permit. The defendant said that he told Mr. Burrell that he "wasn't able to be no bouncer, but [he would] show up." The defendant stated that prior surgery on his hands, knees, and neck prevented him from working as a bouncer.

He arrived at the party location at approximately 5:00 p.m. and helped Mr. Burrell set up for the party. The defendant said that he could not "remember much" of the struggle with the victim, explaining, "[I]t seems like . . . he come running at me or something, and I throwed (sic) my hand up and said, 'Stop, wait,' or something to that effect. I mean, I can't really remember." He testified that the next thing he remembered was the victim's lying "there on the ground and he's cut, and I took my shirt off and put it on his side." The defendant claimed that he was frightened and confused at the time. The defendant insisted that he did not intend to kill the victim, saying, "I never planned on hurting nobody. I mean, I ain't never hurt nobody. I've always tried to do the right thing." He could not recall kicking the victim's tent prior to the homicide.

The defendant testified that in addition to his medical issues, he had been treated by Doctor Gilson for mental health issues for several years and had been hospitalized

for those issues "a lot." The defendant said that he had been "attacked by trolls one time in [his] yard," explaining, "I didn't know where it come from. I didn't know where they come from at all, and then all at once, blam, there they was, you know, just on my legs and everything." He stated that he telephoned police, who transported him to the mental hospital. The defendant said that he often suffered from panic attacks. He conceded that he consumed alcohol "every once in a while" even though doctors told him that he should not do so while on medication.

Based upon this evidence, the jury convicted the defendant of the lesser included offense of second degree murder. The trial court imposed a sentence of 20 years' incarceration to be served at 100 percent by operation of law. Following a timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by denying him funds to hire an independent expert, by refusing to permit his treating psychiatrist to testify about his history of mental illness, by refusing his request to play the video-recorded statements of certain witnesses in their entireties, by denying his request for a mistrial, by refusing to provide a jury instruction on self-defense, and by failing to apply certain mitigating factors to reduce his sentence. We will consider each claim in turn.

*I. Independent Expert*

The defendant first asserts that the trial court erred by denying his request "for an independent psychological evaluation and/or expert." The State contends that the trial court did not abuse its discretion by denying the defendant's request for expert funds because the defendant failed to make a showing of particularized need and because the court provided the defendant with a state-funded evaluation.

Tennessee Supreme Court Rule 13, section 5, governs the provision of funds to procure the assistance of expert assistance for an indigent defendant: "[T]he court, in an ex parte hearing, may in its discretion determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected." Tenn. Sup. Ct. R. 13, § 5(b); *see also* T.C.A. § 40-14-207(b) (2005) (authorizing funding for expert services to an indigent defendant pursuant to the supreme court rules). "Funding shall be authorized only if, after conducting a hearing on the motion, the court determines that there is a particularized need for the requested services . . . ." Tenn. Sup. Ct. R. 13, § 5(c)(1). To establish a "particularized need," the defendant must show "by reference to the particular facts and circumstances that the requested services relate to a matter that, considering the inculpatory evidence, is likely to be a significant issue in the defense at trial and that the requested services are necessary to protect the defendant's right to a fair trial." *Id.* § 5(c)(2); *see also State v. Barnett*, 909 S.W.2d 423, 430 (Tenn. 1995)

("'[T]he right to assistance of state paid experts exists only upon a showing of a particularized need. The defendant must show that a substantial need exists requiring the assistance of state paid supporting services and that his defense cannot be fully developed without such professional assistance.'") (quoting *State v. Evans*, 838 S.W.2d 185, 192 (Tenn. 1992)). The rule also sets forth some limitations on "particularized need":

> Particularized need cannot be established and funding requests should be denied where the motion contains only:
> (A) undeveloped or conclusory assertions that such services would be beneficial;
> (B) assertions establishing only the mere hope or suspicion that favorable evidence may be obtained;
> (C) information indicating that the requested services relate to factual issues or matters within the province and understanding of the jury; or
> (D) information indicating that the requested services fall within the capability and expertise of appointed counsel.

Tenn. Sup. Ct. R. 13, § 5(c)(4); *see also Barnett*, 909 S.W.3d at 430 (quoting *State v. Cazes*, 875 S.W.2d 253, 261 (Tenn. 1994) and stating that a showing of particularized need must consist of "'more than undeveloped assertions that the services [are] needed to attempt to counter the State's proof.'").

Our supreme court has adopted a two-pronged test to determine "particularized need": "(1) the defendant must show that he or she 'will be deprived of a fair trial without the expert assistance'; and (2) the defendant must show that 'there is a reasonable likelihood that [the assistance] will materially assist [him or her] in the preparation of the case.'" *State v. Scott*, 33 S.W.3d 746, 753 (Tenn. 2000) (quoting *Barnett*, 909 S.W.2d at 430). Most importantly, the need for expert services must "be determined on a case-by-case basis, and in determining whether a particularized need has been established, a trial court should consider all facts and circumstances known to it at the time the motion for expert assistance is made." *Barnett*, 909 S.W.2d at 431. The trial court's denial of expert services will not be overturned absent a showing that the trial court abused its discretion. *See Barnett*, 909 S.W.2d at 431.

Here, the defendant requested and received a state-funded forensic mental evaluation. Dissatisfied with the quality of the evaluation and the conclusion reached by the evaluators, the defendant moved the court to either provide state funds to procure another evaluation or grant a continuance so he could raise the funds to procure his own. The trial court denied both, finding that it had provided the defendant with all that was constitutionally

required and that the defendant had already been provided ample time to hire an expert if he so desired. Despite the denial of a continuance, the defendant did not proceed to trial for another eight months.

We agree with the trial court that the defendant was provided with all that was constitutionally required. He asked for and received a state-funded evaluation of his mental health at the time of the offense. The defendant made no showing of a particularized need for additional expert assistance. Indeed, the entirety of the defendant's showing consisted solely of his conclusory assertion that the previously-performed evaluation was insufficient.[1] Because the defendant failed to make a threshold showing of particularized need, the trial court did not abuse its discretion by refusing him funds to procure additional expert services. *See Ruff v. State*, 978 S.W.2d 95, 101 (Tenn. 1998).

## II. Doctor Gilson

The defendant next contends that the trial court erred by ruling that his treating psychiatrist, Doctor Troy Gilson, would not be permitted to testify about the defendant's history of mental illness. The State asserts that the defendant has waived our consideration of this issue by failing to support his argument with citation to relevant authorities. In the alternative, the State argues that the trial court did not abuse its discretion by prohibiting the testimony.

As the State correctly points out, the defendant has waived this issue by failing to support it with citation to relevant authorities. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Even in the absence of waiver, however, we cannot conclude that the trial court abused its discretion by excluding the proffered testimony. The defendant wanted Doctor Gilson to testify "about all of the problems and/or extraordinary or bizarre acts" manifested by the defendant during the course of his 15 years of psychiatric treatment. The trial court correctly deemed that testimony irrelevant. *See* Tenn. R. Evid. 402. Only the defendant's mental state at the time of the crime was relevant, and his behavior, no matter how "extraordinary or bizarre," in years past was not. Moreover, it is clear from the defendant's offer of proof that Doctor Gilson would not have testified that the defendant was insane at the time of the crime or that he was suffering from a mental disease or defect that would have prevented him from forming the requisite culpable mental state, *see State v. Ferrell*, 277 S.W.3d 372, 379 (Tenn. 2009) (quoting *State v. Hall*, 958

---

[1]The defendant makes much of the fact that the trial court had granted additional services under similar circumstances in an unrelated case. The trial court's actions in another case are wholly irrelevant to the determination whether this defendant made the requisite showing of particularized need.

S.W.2d 679, 690 n. 9 (Tenn. 1997) ("'Evidence that the defendant suffered from a mental disease or defect shall be admissible whenever it is relevant to prove that the defendant did or did not have the state of mind which is an element of the offense.'"). Indeed, Doctor Gilson testified that, despite the defendant's history of mental illness, he could not conclude that the defendant was legally insane at the time of the crime. In reality, the proffered testimony potentially could have done the defendant's case far more harm than good, and the trial court did not abuse its discretion by excluding it.

### III. Recorded Witness Statements

The defendant complains that the trial court erred by ruling that he could not play the video-recorded statements of various State witnesses in their entireties, thereby depriving him of the "best evidence" at trial. The State contends that the trial court did not abuse its discretion by excluding the recordings.

The record establishes that the defendant wanted to play the recorded statements to impeach State witnesses whose trial testimony he believed to be contradictory to their pretrial statements to police. The trial court correctly ruled that the defendant would be permitted to play those portions of the recordings that contained the prior inconsistent statements. When a witness testifies in a manner that is inconsistent with a previously recorded statement, the witness's testimony may be impeached with the prior inconsistent statement. Tenn. R. Evid. 613. Extrinsic evidence of the prior inconsistent statement is inadmissible unless the witness denies making the statement or equivocates about making it. *Id.* Nothing in this rule permits the admission of a witness's prior statement in its entirety. Moreover, the defendant failed to show that fairness required the admission of the recordings via Tennessee Rule of Evidence 106. *See* Tenn. R. Evid. 106 ("When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."). The recordings contained little in the way of relevant, admissible evidence and much in the way of irrelevant, inadmissible evidence. As a result, the trial court did not abuse its discretion by ruling that the defendant would be limited to playing only the portions of the recordings that qualified as prior inconsistent statements.

### IV. Mistrial

The defendant asserts that the trial court erred by denying his request for a mistrial after Ms. Vetten testified that she had previously purchased drugs from the defendant. The State contends that the trial court committed no error.

Initially, we note that the defendant has waived our consideration of this issue by failing to support his argument with citation to any relevant authority. *See* Tenn. Ct. Crim. App. R. 10(b). Moreover, the record establishes that the defendant is not entitled to relief on this issue.

The decision to grant or deny a mistrial is entrusted to the sound discretion of the trial court, and this court will disturb the trial court's ruling in this regard only when there has been an abuse of the trial court's discretion. *See State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009). "Normally, a mistrial should be declared only if there is a manifest necessity for such action." *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003) (citing *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991)). "'In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did.'" *Saylor*, 117 S.W.3d at 250 (quoting *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). The burden of establishing the necessity for mistrial lies with the party seeking it. *Id*.

The record establishes that when the prosecutor asked Ms. Vetten how she came to know the defendant, Ms. Vetten testified that she had been to the defendant's home with Mr. Burrell for the purpose of purchasing hydrocodone. The defendant objected, and the trial court sustained the objection and struck the testimony from the record. The defendant requested a mistrial on the basis of the prejudicial testimony and dismissal of the charges based upon the State's intentional solicitation of the inadmissible evidence. The trial court chastised the State but denied the defendant's requests. Instead, the trial court provided a curative instruction to the jury:

> Ladies and gentlemen, before our just recent break, there was some testimony from the witness currently, that will be back on the stand, about an alleged prior drug dealing between the witness and the defendant. I have sustained defense counsel's objections to any such testimony. We are not here to try anything except the indicted offenses. I will instruct the jury that you should disregard all of the testimony of this witness about any such prior dealings, and further, that you cannot use anything that she said about this alleged prior dealing in your deliberation process. I have also instructed the State not to attempt to get any similar evidence before the jury.

The trial court's actions remedied any error attributable to the testimony, and the grant of a

mistrial was not warranted under the circumstances.

## V. Self-Defense

The defendant asserts that the trial court erred by ruling that the defendant had to testify before it would provide a jury instruction on self-defense and by refusing to provide a jury instruction on self-defense even after the defendant's testimony fairly raised the defense. The State contends that an instruction on self-defense was not warranted under the proof adduced at trial.

Once again, the defendant has waived our consideration of this issue by failing to support his argument with citation to any authority. *See* Tenn. Ct. Crim. App. R. 10(b). The defendant is similarly not entitled to relief on the merits of his claim. The record does not support the defendant's claim that the trial court ruled that the defendant had to testify before it would give an instruction on self-defense. To the contrary, the trial court simply concluded that the defense of self-defense had not been fairly raised by the proof at the conclusion of the State's case-in-chief and that it would not, therefore, instruct the jury on self-defense. During the *Momon* colloquy, *see Momon v. State*, 18 S.W.3d 152 (Tenn. 1999), the defendant stated that he had voluntarily chosen to testify on his own behalf. Additionally, the record supports the trial court's conclusion that self-defense had not been fairly raised by the proof adduced during the State's case-in-chief. Indeed, the only proof at that point that even hinted at self-defense came during the cross-examination of Ms. Cooper, when she admitted that she told police that the victim "went after" the defendant when he exited the tent. Ms. Cooper qualified her testimony, however, by stating that the victim never even gained his feet before the defendant attacked him.

Finally, even the defendant's testimony failed to fairly raise the issue of self-defense such that an instruction was required. The defendant testified that he did not recall the struggle with the victim. When pressed by defense counsel, the defendant said, "[I]t seems like . . . he come running at me or something, and I throwed (sic) my hand up and said, 'Stop, wait,' or something to that effect. I mean, I can't really remember." Most importantly, however, the evidence overwhelmingly established that the defendant provoked any action by the victim by refusing the victim's requests that he leave and by kicking down the tent shared by the victim and Ms. Cooper. *See* T.C.A. § 39-11-611(d)(1)-(2); *see also State v. Thacker*, 164 S.W.3d 208, 245 (Tenn. 2005). Regardless whether the defendant filed a timely notice that he intended to rely on self-defense or that he argued to the jury that the killing was in self-defense, "[t]he evidence, not the theories of the parties, controls whether an instruction is required." *State v. Allen*, 69 S.W.3d 181, 188 (Tenn. 2002).

*VI. Sentencing*

Finally, the defendant contends that the trial court erred by failing to apply several mitigating factors to reduce his sentence. Specifically, he claims that the trial court should have applied mitigating factors based on his compensating the victim, his mental condition at the time of the offense, his assistance to authorities following the crime, and the unusual circumstances of the offense. The State submits that the defendant's 20-year sentence was justified.

When considering challenges to the length and manner of service of a sentence this court conducts a de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d) (2006). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The appealing party, in this case the defendant, bears the burden of establishing impropriety in the sentence. T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also Ashby*, 823 S.W.2d at 169. If our review of the sentence establishes that the trial court duly considered "the factors and principles which are relevant to sentencing under the Act, and that the trial court's findings of fact . . . are adequately supported in the record, then we may not disturb the sentence even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In making its sentencing decision, the trial court must consider:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
(7) Any statement the defendant wishes to make in the

defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The trial court should also consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5).

In arriving at the 20-year sentence imposed in this case, the trial court applied enhancement factors three, that the offense involved more than one victim, *see id.* § 40-35-114(3); five, that the defendant allowed the victim to be treated with exceptional cruelty, *see id.* § 40-35-114(5); six, that the personal injuries inflicted upon the victim were particularly great, *see id.* § 40-35-114(6); nine, that the defendant employed a deadly weapon during the commission of the offense, *see id.* § 40-35-114(9); and ten, that the defendant had no hesitation in committing a crime when the risk to human life was high, *see id.* § 40-35-114(10).[2] The court concluded that a sentence at the midpoint within the range was appropriate. The trial court did not apply any mitigating factors.

The defendant contends that the trial court should have applied the following mitigating factors to reduce his sentence:

> (5) Before detection, the defendant compensated or made a good faith attempt to compensate the victim of criminal conduct for the damage or injury the victim sustained;
>
> (8) The defendant was suffering from a mental or physical condition that significantly reduced the defendant's culpability for the offense . . . ;
>
> (10) The defendant assisted the authorities in locating or recovering any property or person involved in the crime;
>
> (11) The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct.

*See id.* § 40-35-113(5), (8), (10), (11). In our view, however, the evidence does not support

---

[2]The defendant does not challenge the imposition of the enhancement factors. We note, however, that factors three and six are inapplicable in this case. The trial court gave these factors little weight, and their removal from sentencing consideration does not warrant an adjustment of the defendant's sentence. Factor ten, although not generally applicable to a conviction of second degree murder, was appropriate in this case given the presence of bystanders who could have, and in Mr. Burrell's case were, injured by the defendant's attack on the victim.

the application of mitigating factors five, eight, or ten. The defendant offered the victim no compensation, and it is unclear how the defendant could have compensated the victim for his life. The defendant's allegedly using his shirt to soak up the victim's blood does not equate to compensation as that word is used in the statute. Additionally, although the defendant pointed Officer Bohannon toward the victim as the officer drove by, the record clearly establishes that the defendant's help was neither useful nor significant. *See, e.g.*, *State v. Chris Haire*, No. E2000-01636-CCA-R3-CD (Tenn. Crim. App., Knoxville, Jan. 22, 2002). Further, the defendant established at trial that he had a history of mental illness but failed to establish what role, if any, his mental illness played in the commission of the offense. Arguably, the trial court should have applied factor 11, given the unusual circumstances of the offense and the defendant's lack of a history of violence against others, but the application of this single mitigating factor does not warrant a sentence of less than 20 years.

*Conclusion*

The trial court did not err by refusing to provide the defendant with funds for additional expert assistance, by refusing to permit the defendant's psychiatrist to testify regarding the defendant's unusual behavior, by refusing to permit the defendant to play the video-recorded pretrial statements of State witnesses in their entireties, by denying the defendant's request for a mistrial, or by denying the defendant's request for a jury instruction on self-defense. Although the trial court arguably erred by failing to apply a single statutory mitigating factor, the 20-year sentence imposed by the trial court was justified under the circumstances. Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE