**STATE of Tennessee**

v.

**Bradley FERRELL.**

Supreme Court of Tennessee,
at Nashville.

Oct. 1, 2008 Session.

Jan. 29, 2009.

George A. Burke, Sr., Spencer, Tennessee for the appellant, Bradley Ferrell.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor General; and J. Ross Dyer, Senior Counsel; Lisa Zavagiannis, District Attorney General; and Larry Bryant, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

GARY R. WADE, J., delivered the opinion of the court, in which JANICE M. HOLDER, C.J., CORNELIA A. CLARK, WILLIAM C. KOCH, JR., JJ., and E. RILEY ANDERSON, Sp. J., joined.

The defendant, Bradley Ferrell, was convicted of misdemeanor escape. We granted review to determine whether the trial court committed prejudicial error by excluding expert testimony from a physician as to the defendant's ability to form the requisite *mens rea* for the offense. On direct appeal, the Court of Criminal Appeals affirmed, holding that the trial court did not commit prejudicial error by excluding the expert's testimony under the rule established in *State v. Hall*, 958 S.W.2d 679 (Tenn.1997). After consideration of the record and controlling authority, we hold that the trial court erred by excluding the expert testimony offered to negate the *mens rea* for the offense. Because the error more probably than not affected the result, a new trial is the appropriate remedy. Accordingly, we reverse the judgment of the Court of Criminal Appeals and remand to the trial court for a new trial.

## Background

On September 2, 2000, inmate Bradley Ferrell (the "Defendant"), who was serving a sentence for misdemeanor assault at the Van Buren County Jail, walked out of a cell he shared with other prisoners. Two months later, he was indicted for misdemeanor escape. Tenn.Code Ann. § 39–16–605 (1997). For reasons not apparent in the record, there was a period of delay before defense counsel, on May 3, 2003, sought an evaluation of the Defendant for the purpose of determining whether he was competent to stand trial. The trial court granted the request and, six months later, sustained a motion by the State to refer the Defendant to the Forensic Services Program at Middle Tennessee Health Institute. On March 31, 2004, the trial court ordered the Defendant hospitalized "under Tenn.Code Ann. § 33–7–301 because of alleged mental illness which renders [him] incompetent to stand trial...." [1] When the Defendant was released, the trial court found the Defendant competent and set the case for trial in September of 2005. The Defendant was convicted by a jury of escape, a class A

---

1. At the time of the trial court's order, the relevant statute stated as follows:

   When a defendant charged with a criminal offense is believed to be incompetent to stand trial, or there is a question about the defendant's mental capacity at the time of the commission of the crime, the criminal, circuit, or general sessions court judge may, upon such judges own motion or upon petition by the district attorney general or by the attorney for the defendant and after hearing, order the defendant to be evaluated on an outpatient basis. The evaluation shall be done by the community mental health center or licensed private practitioner designated by the commissioner to serve the court or, if the evaluation cannot be made by the center or the private practitioner, on an outpatient basis by the state hospital or the state-supported hospital designated by the commissioner to serve the court. If and only if the outpatient evaluator concludes that further evaluation and treatment are needed, the court may order the defendant hospitalized, and if in a department facility, in the custody of the commissioner for not more than thirty (30) days for further evaluation and treatment for competence to stand trial subject to the availability of suitable accommodations.

   Tenn.Code Ann. § 33–7–301(a)(1) (2001 & Supp.2003).

misdemeanor, and sentenced to eleven months and twenty-nine days in the county jail. All but sixty days were suspended. The record on appeal includes the evidence submitted at a pre-trial proceeding as well as the proof at trial.

### Pre-trial Hearing

Just prior to trial, the Defendant asked for permission to call Dr. Steven Adams as a witness. The trial court then conducted a hearing to determine whether Dr. Adams could qualify as an expert in order to offer an opinion as to the Defendant's ability to form the required mental state for the offense.[2] Dr. Adams, an assistant professor of family medicine at the University of Tennessee at Chattanooga, supervised residents in training in family medicine at the university at the time but also spent approximately one-third of his time treating patients. Dr. Adams, who expressed considerable familiarity with the medical history of the Defendant, testified that the Defendant had suffered a brain injury in 1997, leaving him comatose for several days and requiring a ventilator for life support, that caused fixed deficits in his cognition, short- and long-term memory, and in the awareness of his surroundings. Dr. Adams, who had both treated the Defendant and supervised four other physicians[3] who had also provided him with medical care, testified that an electroencepholography ("EEG") performed while the Defendant was in the hospital was "severely abnormal." Another EEG performed after the Defendant's discharge

confirmed a "mild global slowing" and "an underlying brain disorder." In September of 2003, a computed tomography ("CT") scan indicated "mild changes consistent with atrophy, [or] shrinking of the brain." Having treated "thousands" of patients, Dr. Adams estimated that thirty percent of those under his care had "mental or psychiatric issues." It was his opinion that the Defendant suffered from toxic encephalopathy, a synonym for organic brain syndrome, and was not "competent to intentionally commit a crime that requires planning ahead of time simply because he has deficits in memory."

Dr. Adams, who conceded that he did not specialize in the field of psychiatry and that he had never given a psychiatric opinion in a trial, testified that the Defendant did not have a psychiatric condition. It was his opinion that the Defendant instead had a brain injury, which "would be classified on a different axis" and which caused deficits in cognition. Dr. Adams described the deficits as "static," unchanged by time and "the same now as what I saw when I discharged him from the hospital [in] January of 1998." According to Dr. Adams, the Defendant also experienced seizures which had been difficult to control with medications. When asked whether the Defendant might remember back to the date of his departure from the jail, Dr. Adams answered, "I can't imagine he would remember it." He explained that the Defendant's condition placed limitations on his ability to think and his under-

---

2. The trial court also conducted a pre-trial hearing on the issue of whether the defendant was competent to stand trial, during which the parties presented the testimony of Dr. Adams; Dr. Ronnie Stout, a psychologist; and Dr. Robert Zylstra, a licensed clinical social worker. The trial court determined that the Defendant was competent to stand trial. The Court of Criminal Appeals affirmed. This issue is not before this Court.

3. Doctors Mark Praedes, Robert Wescott, Mark Lee, and Jason Robertson had treated the Defendant at different intervals from 1998 through 2005. Between 1998 and 2005, the Defendant was treated by Dr. Adams or one of the other physicians on fifty-two separate occasions.

standing of the consequences. During cross-examination, Dr. Adams acknowledged the Defendant would "probably" have been aware that he was in jail and may have known he was walking out the door at the time he did so, but would not have understood the consequences of his actions.

The State objected to the testimony, arguing that Dr. Adams was not qualified to give a psychiatric opinion as to the mental state of the Defendant. The trial court excluded the evidence, holding that the jury could not consider "testimony regarding capacity on a non-specific intent crime." Afterward, the following exchange took place:

THE COURT: I will deem him as an admissible expert in the area of medicine and diagnosing the particular brain disorder that the defendant has ..., so I will grant that to some extent but the other part dealing with the—what were you just saying?

[THE STATE]: The psychiatric. According to [State v.] Hall, [958 S.W.2d 679 (Tenn.1997)], you have to introduce psychiatric testimony. If you were going to do it in a specific intent crime it would still have to be—

THE COURT: I agree. He was not admitted as a psychiatric expert.

### Trial

Just before midnight on September 2, 2000, Juanita Brymer, who served as a jailor at the Van Buren County Jail, responded to a complaint by James McCormick, who shared a cell with the Defendant, that the oxygen machine of Paul Grissom, a third cell mate, was not working properly. As Brymer checked the oxygen machine, the Defendant walked outside of the cell several times but returned whenever she directed him to do so. As Brymer retrieved some tubes for the oxygen machine, McCormick stepped out of the cell, followed by the Defendant, and remarked to the officer, "Don't give us any problems." As McCormick walked out of the facility, the Defendant followed. According to Brymer, McCormick appeared to have developed the escape plan. She explained that the Defendant appeared to have simply followed McCormick's lead.

Later in the day, Jerry Hodges, a part-time reserve officer for the Van Buren County Sheriff's Department, apprehended the two men at the residence of McCormick's sister. When questioned about the level of the Defendant's involvement, Hodges stated that "anyone could lead [him] anywhere."

McCormick, a witness for the defense, acknowledged that he had devised the plan for the escape and had complained to the jailor about the oxygen machine as a pretext. He confirmed that when the jailor returned to the cell, leaving the door unlocked behind her, he directed her to get in the cell because he "was going to leave." McCormick described the Defendant, who followed him out, as "on medication and stuff," and stated that he did not know if the Defendant "really kn[ew] what he was doing." McCormick conceded, however, that he mentioned his plan to the Defendant before the jailor arrived, and that after the escape, the two men went to the Defendant's house, a place McCormick had never been, where a relative of the Defendant agreed to drive them to McCormick's truck.

The Defendant testified in his own defense, saying only that he had no memory of the events that took place at the jail on the date of the offense: "I can't remember that far back." At the conclusion of their deliberations, the jury returned a verdict of guilt.

On direct appeal, the Court of Criminal Appeals affirmed the conviction, holding that the trial court did not abuse its discretion by ruling that Dr. Adams could not testify as a psychiatric expert. The rationale of the majority was as follows:

> [E]ven if the ruling were in error, it was harmless because Dr. Adams would not have testified that the defendant lacked the capacity to form the intent required for the crime of escape, nor would he have said that the defendant did not know that he was in jail or that leaving jail was a crime. *In sum, the proffered testimony of Dr. Adams regarding "intent" was not relevant to the crime with which the defendant was charged and would not have benefitted him.*

*State v. Ferrell,* No. M2005–02552–CCA–R3–CD, 2007 WL 2409575, at *11 (Tenn. Crim.App. Aug.24, 2007) (emphasis added). In dissent, Judge D. Kelly Thomas, Jr. opined that the trial court's ruling prevented the Defendant from presenting evidence on the "key element of his defense," and expressed the view that the error was prejudicial. *Id.* at *13 (Thomas, J., dissenting).

### *Analysis*

■ Escape is the "unauthorized departure from custody." Tenn.Code Ann. § 39–16–601(3) (1997). Because this statute "does not plainly dispense with a mental element, intent, knowledge or recklessness suffices to establish the culpable mental state." Tenn.Code Ann. § 39–11–301(a)(2)(c) (1997). These culpable mental states are defined as follows:

> (a) "Intentional" refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's *conscious objective or desire to engage in the conduct or cause the result.*

> (b) "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is *aware of the nature of the conduct or that the circumstances exist.* A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

> (c) "Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but *consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur.* The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn.Code Ann. § 39–11–302(a)–(c) (1997) (emphasis added).

The Defendant argues that the trial court committed reversible error by excluding Dr. Adams' testimony on the issue of whether he lacked the capacity to form the mental state required for escape, i.e., intentional, knowing or reckless. In response, the State submits that the trial court properly excluded the testimony by virtue of the holding in *State v. Hall,* 958 S.W.2d 679, 689 (Tenn.1997), because Dr. Adams was not qualified in the field of psychiatry. In the alternative, the State asserts that any error was harmless because Dr. Adams' testimony would have had no effect on the results of the trial.

The admissibility of any evidence is governed in part by the general provisions as to relevance. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence

to the determination of the action more probable or less probable that it would be without the evidence." Tenn. R. Evid. 401. In general, relevant evidence is admissible and irrelevant evidence is not. Tenn. R. Evid. 402. However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

The admissibility of expert testimony is specifically governed by Rules 702 and 703 of the Tennessee Rules of Evidence. Rule 702 provides as follows:

**Testimony by experts.** If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Rule 703 is as follows:

**Bases of opinion testimony by experts.** The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

■ Expert testimony must meet the standards set out in *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257, 265 (Tenn.1997), wherein this Court established five non-exclusive factors to evaluate reliability and admissibility: "(1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether, as formerly required by *Frye*, the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation."

■ As a threshold issue, the trial judge must first consider whether a witness qualifies "by knowledge, skill, experience, training, or education" to offer an opinion within the area of his or her expertise. *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002). If the expert is so qualified, the trial judge must then "analyze the science and not merely the qualifications, demeanor or conclusions of experts." *McDaniel*, 955 S.W.2d at 265. When those two criteria are met, it is only when "there is ... too great an analytical gap between the data and the opinion proffered," that the evidence may be excluded. *Stevens*, 78 S.W.3d at 834 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

■ Generally speaking, the trial court is afforded broad discretion in resolving questions concerning the admissibility of expert testimony; in consequence, we will not overturn its ruling on appeal absent a finding that it abused its discretion. *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007); *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn.1993). The abuse of discretion standard contemplates that before reversal the record must show that a judge "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn.1999) (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn.

1997)); *see also Copeland,* 226 S.W.3d at 301.

In *Hall,* this Court, while applying Rules 702 and 703, concluded that "psychiatric evidence that [a] defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged is admissible under Tennessee law." 958 S.W.2d at 689. In reaching this conclusion, this Court specifically held that "the negation of an element of a criminal offense is recognized as a defense in Tennessee." *Id.* (citing Tenn.Code Ann. § 39–11–203(e) ( [1] ) (1991 & Supp.1996)). Moreover, our ruling included the following explanation:

> [T]o avoid confusion . . . , we caution that such evidence should not be proffered as proof of "diminished capacity." Instead, such evidence should be presented to the trial court as relevant to negate the existence of the culpable mental state required to establish the criminal offense for which the defendant is being tried.

*Hall,* 958 S.W.2d at 690. This Court likened Tennessee's rule to the Model Penal Code, which does not mention the term "diminished capacity" and instead emphasizes that "[e]vidence that the defendant suffered from a mental disease or defect shall be admissible whenever it is relevant to prove that the defendant did or did not have the state of mind which is an element of the offense." *Id.* at 690 n. 9 (quoting *Model Penal Code,* § 4.02(1) (Official Draft 1962)).

Importantly, our decision in *Hall* was predicated upon a fundamental principle of due process: "[n]o person may be convicted of an offense unless . . . [t]he culpable mental state required is proven beyond a reasonable doubt." *Id.* at 689 (quoting Tenn.Code Ann. § 39–11–201(a)(2) (1991)); *see also State v. Abrams,* 935 S.W.2d 399, 402 (Tenn.1996). Nothing in *Hall* limited

its application to psychiatric testimony or specifically precluded other forms of expert testimony regarding a defendant's capacity to form a requisite mental state. Instead, our decision in *Hall* established that the testimony is properly admissible if it satisfies the relevancy and expert testimony provisions in the Tennessee Rules of Evidence and its content indicates that a defendant lacked the capacity to form the required mental state for an offense:

> Since the general criminal law requires that mental state be proven by the State beyond a reasonable doubt, it is certainly a "fact of consequence" to the outcome of a criminal prosecution. *Therefore, evidence which tends to prove or disprove the required mental state is relevant and generally admissible under Tennessee law.*

958 S.W.2d at 689 (emphasis added). In summary, although our holding in *Hall* referred specifically to psychiatric evidence under the circumstances of that case, it was based upon the broader legal principle that "expert testimony relevant to negating intent is admissible in Tennessee even though diminished capacity is not a defense." *Id.* at 691.

Here, the transcript confirms that the trial court may have misapprehended the principles applicable to the admission of expert testimony for the purpose of negating a required mental state. Prior to excluding Dr. Adams' testimony, for instance, the trial court observed that

> there was a proffer or a request for an instruction dealing with . . . incapacity or lack of . . . required mental state necessary in this particular case. I have looked at the case law that has been given to me. *The Court finds that the diminished capacity may be only used to negate the . . . mens rea of a specific intent crime.* . . . So I don't believe that would be appropriate.

(emphasis added). Although defense counsel pointed out that Dr. Adams' testimony was offered to negate an element of the offense rather than offered as support for any diminished capacity defense, the trial court nevertheless concluded that "this is not a specific intent crime and the diminished capacity issue is not relevant." Even after the proffer of Dr. Adams' testimony, the trial court held firm to the core of its ruling that escape "[is] not a specific intent crime," and, while observing that Dr. Adams could testify as a *medical* expert, it would not permit him to testify whether the Defendant was capable of forming the required *mens rea* for the charged offense.

■ As stated, this Court in *Hall* recognized that a defendant may negate an element of the offense as a defense to the prosecution. It was not our purpose to distinguish between specific and general intent offenses or otherwise limit a defendant's ability to negate an element of the offense. When, therefore, a defendant seeks to utilize expert testimony to negate an element of the offense, trial courts must consider the evidentiary principles pertaining to relevancy and expert testimony as set forth in the Tennessee Rules of Evidence. *See Hall*, 958 S.W.2d at 689. As noted, a misapplication of the law qualifies as an abuse of discretion. *See Copeland*, 226 S.W.3d at 301. In our view, the trial court misapplied the law, and, in consequence, Dr. Adams should have been permitted to testify.

■ Moreover, the error in this case cannot be classified as harmless. *See* Tenn. R.App. P. 36(b). This Court recently held as follows:

Tennessee's harmless error doctrine, reflected in Tenn. R.App. P. 36(b), rests on a foundation that recognizes that a person accused of a crime is entitled to an essentially fair trial and that a person convicted of a crime as a result of an essentially fair trial is not entitled to have his or her conviction reversed based on errors that, more probably than not, did not affect the verdict or judgment. When the appellate courts conduct a harmless error analysis using Tenn. R.App. P. 36(b), they must be careful to avoid becoming a second jury by conflating the harmlessness inquiry with their own assessment of the defendant's guilt. The analysis is more than simply a calculation of whether sufficient evidence exists to support the conviction. It requires a careful examination of the entire record to determine whether the non-constitutional error involving a substantial right "more probably than not affected the judgment or would result in prejudice to the judicial process."

*State v. Rodriguez*, 254 S.W.3d 361, 373–74 (Tenn.2008) (citations omitted) (footnotes omitted).

The testimony in this instance met not only the relevancy standards but also those governing the admission of expert testimony. Tenn. R. Evid. 702, 703. Dr. Adams had practiced internal medicine for eight years and had served as an associate professor in the Department of Family Medicine at the University of Tennessee at Chattanooga for seven years. He first treated the Defendant in the Erlanger Hospital emergency room in December 1997. Afterward, he either treated the Defendant or supervised the Defendant's medical care over a period of nearly seven years until the time of trial. While acknowledging that the Defendant did not suffer from a psychiatric condition, Dr. Adams made a diagnosis of organic brain syndrome, a condition causing deficits in cognition, and in short-term and long-term memory, which had an adverse effect upon the Defendant's awareness of his surroundings. It was his opinion that the Defendant was not "competent to inten-

tionally commit a crime that requires [any degree of] planning ..." and that the Defendant was unaware of "the full consequences of [his] action."

This testimony from a long-term medical provider directly addressed whether the Defendant acted intentionally, knowingly, or recklessly as required to commit escape, an essential element of the crime. An "intentional" act requires evidence of a defendant's "conscious objective or desire;" a "knowing" act requires evidence that a defendant was "aware of the nature of the conduct" or the surrounding circumstances; and a "reckless" act requires evidence that a defendant was "aware of but consciously disregard[ed] a substantial and unjustifiable risk." *See* Tenn.Code Ann. § 39–11–302(a)–(c). Unlike the Court of Criminal Appeals, we view Dr. Adams' testimony as probative on each of the alternative mental states required to support the offense of escape. The evidence should have been considered by the jury. Moreover, the exclusion of the testimony divested the Defendant of any real opportunity to present his only meaningful defense to the crime. Because the error more likely than not affected the result, a new trial is the appropriate remedy. *See Rodriguez,* 254 S.W.3d at 378.

### *Conclusion*

After carefully reviewing the record and controlling authority, we hold that the trial court erroneously excluded expert testimony that was offered to negate the requisite *mens rea* for the offense and that a new trial is warranted. Accordingly, we reverse the judgment of the Court of Criminal Appeals and remand to the trial court for a new trial. Costs of the appeal are taxed to the State of Tennessee.