IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 9, 2015 Session

**STATE OF TENNESSEE v. LESERGIO DURAN WILSON**

**Appeal from the Criminal Court for Davidson County**
**No. 2010-B-1227      Cheryl A. Blackburn, Judge**

**No. M2014-01487-CCA-R9-CD – Filed September 2, 2015**

The Defendant-Appellant, Lesergio Duran Wilson, was charged with first degree premeditated murder, and the State filed its notice of intent to seek the death penalty. Wilson then filed a notice of intent to introduce expert testimony regarding his mental diseases, defects, and other mental conditions bearing on his guilt for the charged offense, and the State filed a motion to exclude this expert testimony. Following an evidentiary hearing, the trial court granted the State's motion. In this interlocutory appeal, Wilson argues that the trial court erred in ruling that he could not present expert testimony during the guilt/innocence phase of trial regarding his incapacity to form the requisite culpable mental states for the offense. Upon review, we affirm the judgment of the trial court and remand this matter for further proceedings consistent with this opinion.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Criminal Court Affirmed and Remanded**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Paul Bruno, Brentwood, Tennessee, and Luke A. Evans, Murfreesboro, Tennessee, for the Defendant-Appellant, Lesergio Duran Wilson.

Robert E. Cooper, Jr., Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Thomas B. Thurman, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

On October 14, 2009, David Hurst was fatally shot inside a trailer he shared with his girlfriend, Doris Williams. Following his apprehension, Wilson admitted to police

that he fired the shots after Williams[1] offered to pay him $1,000 to kill Hurst, who she claimed had been abusing her. Less than twenty-four hours prior to the shooting, Wilson stole a vehicle that he and his girlfriend later drove to Williams's trailer. He brought a gun and rubber gloves with him to the scene of the shooting. When Wilson arrived at Williams's home, he sat in the stolen vehicle for a short time before entering the unlocked front door of the trailer. He walked into the bedroom, placed a pillow over Hurst, and shot Hurst multiple times through the pillow, ostensibly for the purpose of reducing the sound of the gunshots. Before Wilson arrived, Williams staged the trailer to look as if a robbery had occurred. After the shooting, Williams gave Wilson more than $500 dollars but less than the $1000 they had agreed upon, and she asked Wilson to spray her in the face with a can of mace to make the staged robbery look more believable, which he did. He then fled the trailer and abandoned the stolen vehicle near the Percy Priest Dam. Wilson was subsequently charged with first degree premeditated murder.

Following his indictment, Wilson filed written notice pursuant to Tennessee Rule of Criminal Procedure 12.2(b) of his intent to introduce expert testimony from Dr. Jonathan Lipman and Dr. Susan Rich "relating to mental diseases, defects and other mental conditions of Mr. Wilson bearing on the issue of his guilt of the offense of first degree premeditated murder charged in this indictment." The State then filed a motion to exclude this testimony on the basis that it was irrelevant, that it was mere speculation regarding Wilson's state of mind at the time of the offense, and that it was inadmissible pursuant to Hall and its progeny. On May 30, 2014, the trial court conducted an evidentiary hearing on the State's motion, during which both Dr. Rich and Dr. Lipman testified.

Dr. Joseph Lipman, a Ph.D in neuropharmacology, was tendered as an expert in the field of neuropharmacology without objection from the State. Dr. Lipman stated that neuropharmacology deals with the effects of drugs and alcohol on nerve brain behavior. He explained that "an individual's chronic drug use is very, very important in understanding how a drug will affect [a person] at some later time" because the person carries with them the injuries caused by the drug use. He noted that Wilson began smoking marijuana cigarettes rolled with either crack or powder cocaine at age eight or nine, began drinking alcohol at age ten, began regularly smoking marijuana and drinking alcohol without limitation at age thirteen and fourteen, used cocaine as frequently as he could obtain it at age sixteen, and later abused Xanax and ecstasy. Dr. Lipman stated that in addition to the impairments Wilson received while in utero from his mother's drug and

---

[1] We acknowledge that we do not use titles when referring to every witness. We intend no disrespect in doing so. Judge John Everett Williams believes that referring to witnesses without proper titles is disrespectful even though none is intended. He would prefer that every adult witness be referred to as Mr. or Mrs. or by his or her proper title.

alcohol abuse, Wilson's own drug use during his developmental years altered his brain development.

Dr. Lipman determined, based on accounts from Alicia Williams and Yvonne Holt, that Wilson was in a constant state of intoxication and was openly using ecstasy and Xanax in 2009, the year of the offense. He said that ecstasy users often took Xanax, a tranquilizer, because they believed that it would mitigate the adverse effects of their ecstasy use; however, in reality, Xanax caused individuals to have anxiety, paranoia, and psychosis and led to further addiction of ecstasy when chronically used. Dr. Lipman admitted he did not have any "qualitative numbers" regarding Wilson's level of intoxication or any specific information about Wilson's drug use during the day or night of the offense; however, he said witnesses had disclosed that Wilson was "popping pills back to back" and was "drinking continuously morning to night and through the night on those nights that he didn't go to sleep." Moreover, during Dr. Lipman's examination of him, Wilson admitted that he was a daily user of ecstasy and alcohol. Dr. Lipman said there was no indication that Wilson did not ingest alcohol or ecstasy on the day of the victim's death.

When Dr. Lipman asked Alicia Williams, Wilson's girlfriend, about the effects of Wilson's alcohol and drug abuse in 2009, Williams stated that Wilson "couldn't sit still" and was "paranoid." Alicia Williams described an incident when a SWAT team came to Wilson's neighborhood to extract a neighbor who had barricaded himself in his house. When the SWAT team arrived, Wilson began cursing and behaving in a disorderly manner. When Wilson's family was unable to get Wilson under control because of his intoxication, officers took Wilson into custody for his own safety and the safety of all persons in the area.

Dr. Lipman's report, which was entered as an exhibit during the hearing, stated that during the period preceding the victim's murder, Wilson was abusing alcohol and ecstasy and that his intoxication from these substances "would have compounded the underlying neuropsychological impairments (inherited, traumatic, developmental or organic in nature) from which [Wilson] also suffered at the time." He stated that Wilson's alcohol abuse caused "disinhibition, and render[ed] the individual more impulsive, less capable of self[-]control, and more perserverative," which meant that the person was unable "to stop an act once initiated, despite a change in circumstance that render[ed] the act unadvisable." He also said that Wilson's abuse of ecstasy was "associated with sleep disorders, depressed mood, persistent elevation of anxiety, impulsiveness and hostility and selective impairment of episodic memory, working memory and attention, with cognitive deficits persisting for at least 6 months after abstinence and anxiety and hostility remitting after a year of abstinence."

When asked at the hearing if he had an opinion as to Wilson's capacity to formulate the requisite culpable mental state for first degree murder based on his intoxication, Dr. Lipman replied:

It would have to have been impaired. I'm not a lawyer so that I think you probably have to be completely unconscious to have no culpable mental state. I don't think that's what the law is really asking. Somewhere between total unconsciousness and normality there is a region of impairment, and he was certainly in that region of impairment.

Dr. Lipman stated that if premeditation meant something that involved "the application of intelligence, cognitive abilities, the ability to think, [and] judge," then Wilson's ability to do these things "would have been quite dramatically impaired." He added that if Wilson was as intoxicated and as under the influence of ecstasy as witnesses described, he would be "extremely confused," his "perceptions would be distorted," and his "ability to think clearly would be very, very degraded." Moreover, the ill effects from his alcohol and ecstasy use would be worsened by his substance abuse history and his genetic predilection for addiction. In addition, regarding Wilson's capacity to act intentionally in causing the victim's death, he stated that Wilson's "ability to formulate plans . . . and fully understand consequences is even now impaired" based on recent neuropsychological and other tests and that "when you add alcohol to that, you further degrade his ability on those domains."

On cross-examination, Dr. Lipman stated that as a neuropharmacologist, he could provide an opinion as to "[Wilson's] intoxication and the effect on his thinking." However, because he was not a psychologist or a psychiatrist, he could not give an opinion as to whether Wilson had any mental diseases or defects at the time of the offense. He acknowledged that he could not state within a reasonable degree of medical certainty what Wilson's level of intoxication was on the night of the murder because he did not have any blood or breath testing. He conceded that, even after interviewing Wilson, he had no specific information about what alcohol or drugs Wilson ingested on the day of the murder.

Dr. Lipman admitted that Wilson never told the police he was intoxicated the night of the victim's murder. He also admitted that Alicia Williams informed the police that she and Wilson had not ingested any drugs the night of the offense, and that although they had been drinking, Wilson was fine, normal, and not nervous the night of the murder, even though she told police that she and Wilson had gotten drunk and high on drugs at other times. Dr. Lipman acknowledged that Alicia Williams told him there were times when Wilson was not under the influence of alcohol or drugs because he did not have money to purchase these substances. He also acknowledged that Wilson had been

employed for nearly two years around the time of the victim's death but asserted that Wilson's employment was "erratic."

Although Dr. Lipman asserted that the impairment from alcohol and drugs could "outlast the presence of the natural chemical in the blood," he acknowledged that Wilson was able to function at a certain level despite his brain injuries from drinking and drugs. Moreover, he conceded that although Wilson was stopped by police several times, he was never charged with driving under the influence; however, he stated that "more than fifty percent of chronic alcoholics can escape casual detection by trained people." Furthermore, Dr. Lipman recognized that although Wilson had received medical treatment four times near the date of the murder, the medical records associated with this treatment never indicated that Wilson was under the influence of alcohol or drugs during these visits. Dr. Lipman admitted that there were times when Wilson was more competent than others.

Dr. Lipman acknowledged that Wilson stole a vehicle and drove it to the scene of the murder, obtained a gun, wore gloves so that he would not leave fingerprints, used a pillow to attempt to muffle the sound of the gunshots, fired five shots into the victim, collected money for killing the victim, and sprayed mace on Williams to make the murder appear as though it were a home invasion. Despite these acknowledgements, he asserted that it would have required very little cognitive effort for Wilson to steal a car and that Wilson was merely carrying out Doris Williams's scheme the night of the Hurst's death. Although Dr. Lipman recognized that Wilson was unable to drink on the days he did not have money, he asserted that a person who chronically drinks is "massively impaired" even on the days they are not drinking because certain neuropsychological functions take at least three months of abstinence before they are recovered.

When the trial court asked him whether Wilson was incapable of premeditating the victim's death or intentionally killing the victim, Dr. Lipman replied, "As [to] that question . . . , I think the individual would have to be unconscious to be incapable [of premeditating or acting with intent to kill the victim]." He said he was unable to opine that Wilson was incapable of forming the requisite culpable mental states at the time of the offense and could only state that Wilson's capacity to do so was impaired from the chronicity of his substance abuse. When asked by the court if he was precluded from asserting that Wilson was suffering from a mental disease or defect because he was a neuropharmacologist, Dr. Lipman replied, "That's a statutory matter, and in Tennessee I can't. . . . In other places I can."[2]

---

[2] Dr. Lipman, a PhD in neuropharmacology, was likely precluded from testifying that Wilson suffered from a mental disease or defect because he was not qualified by "knowledge, skill, experience, training, or education" to render such an opinion. See Tenn. R. Evid. 702.

Dr. Susan Rich, a psychiatrist, was tendered as an expert in the field of child, adolescent, and adult psychiatry without objection from the State. She stated that she obtained a Tennessee medical license so that she could conduct a neuropsychiatric examination of Wilson. Dr. Rich testified that Wilson suffered from a neurodevelopmental disorder associated with prenatal alcohol exposure (ND-PAE) called fetal alcohol spectrum disorder (FASD), a psychotic disorder, a panic disorder, a post-traumatic-stress disorder, an alcohol use disorder, a cannabis use disorder, and a stimulant use disorder, each of which she deemed to be a severe mental disease or defect that "impaired his functioning." She stated that Wilson's brain injuries, along with his substance abuse from a young age, caused him to have adaptive functioning deficits qualifying him for intellectual disability at a mild level. These adaptive functioning deficits affected the way Wilson "perceives the world, the way that he interacts with other people, the way that he picks up on social cues, misinterprets social cues, the way that he communicates with other people, the way that he understands their communication, the way that he reacts in certain situations."

Dr. Rich asserted that the ND-PAE, which caused damage to Wilson's brain, had psychotic features including delusions and hallucinations that were often confused with schizophrenia. She noted that Wilson believed he was sending out messages from each of the tattoos on his body. She said Wilson often counted the number of objects in a room, and if the number was an even number, he believed the day would be a good one. She also said Wilson insisted on leaving the volume of the television on an even-numbered level. Dr. Rich asserted that Wilson had a bizarre appearance and affect and would often smile inappropriately during a conversation based on the issues being discussed. In addition, she stated that Wilson believed that he was invincible based on his four failed attempts at suicide.

Dr. Rich's report, which was also entered as an exhibit during the hearing, stated that "[b]ased on Mr. Wilson's underlying brain damage, neuropsychiatric conditions, and impaired functioning, it is my clinical opinion that Mr. Wilson suffers from severe mental diseases and defects that could have impaired his ability to act with premeditation in the murder of David Hurst." Her report explained how she reached this opinion:

[B]ecause of [Wilson's] mental defects, he was unable to fully appreciate his own feelings (i.e., alexithymia) and was further dissociated from the events associated with this crime. As a result, his capacity to appreciate the criminality of his conduct was substantially impaired. It is also my opinion that his mental defects caused him to be highly suggestible to the influence of others, and substantially impaired his ability to control his impulses. Finally, his mental defects substantially impaired his ability to appreciate

-6-

the consequences of his actions, and to make decisions using reflection and judgment.

In her report, Dr. Rich also asserted, "It is also my opinion that if Mr. Wilson was intoxicated during the commission of that offense, it is even more likely that his ability to act with premeditation in the commission of that offense was impaired." She provided the following explanation for this opinion in her report:

> Undoubtedly, Mr. Wilson suffers from significant baseline deficits in his mental functioning—particularly in his consequential thinking, lack of impulse control, suggestibility, disinhibition, and socialization skills—as a result of his brain damage and neuropsychiatric deficits (ND-PAE; Psychotic Disorder; PTSD; Panic Disorder). These baseline conditions exist when he is completely sober and free of any intoxicants. When Mr. Wilson uses intoxicants (including alcohol and ecstasy pills), the negative impacts of his mental deficits are greatly exacerbated (made worse), and intoxication further deteriorates his ability to act with reflection and judgment.

At the hearing, when asked what effect Wilson's mental diseases and defects had on his ability to premeditate the victim's murder, Dr. Rich stated:

> Well, in my belief for this particular crime he would have had difficulty to the extent of all of the arrangements that were made in formulating such an elaborate plan. And based on his intellectual capacity, based on his incapacitation due to intoxication I believe he would have a very difficult time and that it would have been impossible.

She added, "[M]y clinical opinion is that a person with his degree of brain damage and his degree of intoxication from alcohol and ecstasy at the time of the event [based on Dr. Lipman's report] . . . is that it would be very difficult for him to have such an elaborate plan himself, create that himself, and implement it." Defense counsel and Dr. Rich then had the following exchange regarding Wilson's capacity to premeditate the victim's murder:

> Q.   . . . Do you think that he lacked the capacity to form the requisite culpable mental state to commit the offense charged in this case?
>
> A.   I do.

Dr. Rich stated that Wilson's false belief that he was invincible, along with his impaired functioning from his brain damage, "impaired his ability to really even understand what he was doing . . . at the time this offense was committed." Instead, she believed that any acts done by Wilson on the day of the victim's death would have been "involuntary" and would have been done as if Wilson were "on auto pilot." She also said that Wilson's "degree of incapacity based on [his] baseline brain functioning superimposed with the intoxication on the day of the event I believe impaired his ability to form an intent." She added, "I believe that it did impact his ability to form an intent and his ability to premeditate, to create such an elaborate plan."

On cross-examination, the State asked Dr. Rich about Wilson's capacity to premeditate the victim's murder:

Q.      Now, let me—just looking at your report you're not saying that he's absolutely incapable of premeditation because of mental disease or defect, are you?

A.      At any given time on a day that he's not also intoxicated and using ecstasy and everything else, but on the day of this event I do believe he was [incapable of premeditation].

She stated that she heavily relied on Dr. Lipman's report as to the degree of Wilson's intoxication on the day of the offense when she made her determination regarding Wilson's incapacity to premeditate. However, she acknowledged there was no scientific proof of Wilson's intoxication on the night of the offense. As cross-examination continued, Dr. Rich retreated from her prior opinion that Wilson lacked the capacity to premeditate and to act intentionally at the time of the offense:

Q.      So is he able to form the intent to rob people out there to get money? He knew if you go over and hold a gun on somebody they give their money and you go back?

A.      I think on any given day—you know, again, on the day of the offense, as I stated in my report, these issues [including Wilson's mental diseases and defects, intoxication, and drug use] could have . . . impaired his ability to . . . premeditate these actions. I didn't say it did because I would have had to be there and evaluate him on that particular day.

Q.      Okay.

A.    And I wasn't there.

. . . .

Q.    But basically it would have to be for one of three people that saw him that particular night at the time of the murder or himself that would actually know his real condition; is that correct? There's no test medically that you can go back several years and determine if a person was intoxicated?

A.    I mean, I guess what you're saying is—and that's what I had just said. I wasn't there on the day of [the offense to observe whether Wilson was intoxicated].

Q.    I understand.

A.    And that's why I said it could have impacted his ability to premeditate, you know, that his mental defects and his mental status as well as his intoxication could have impacted his ability to premeditate.

The trial court also questioned Dr. Rich about whether she believed Wilson lacked the capacity to premeditate and to act intentionally at the time he killed the victim:

Q.    [R]eading your report it says if he was intoxicated. Now, let's do that one first. If he was intoxicated, it could have impacted or affected his ability to premeditate or to form the intent; is that right? It could have?

A.    (Witness moves head up and down [in the affirmative].)

Q.    Are you saying that it did or that it completely eroded his ability to do that?

A.    If he was [intoxicated].

Q.    Okay. But if he was [intoxicated]. But would it have completely made him incapable of [forming premeditation or intent]?

A.    In my clinical opinion I believe so.

Q.    But that's not what your report says.

A.    Well, my report—

Q.    The report says it could have [impaired his ability to act with premeditation in the murder]—and you just testified it could have impacted [his ability to premeditate or to form intent]. If he was intoxicated, it could have. That's different than the question just asked you. Would it have made him incapable of [premeditating the murder]?

A.    So this is why I wrote "could have" because I was not there.

Q.    Okay. I know. But the question I'm asking you is would you testify that he was—if he was intoxicated, was he incapable of forming . . . premeditation or an intent to commit this crime?

A.    Again, I don't mean to—

Q.    It's an important question. I mean, I don't know what your answer is. I'm just trying to find out. Would he be totally incapable of [premeditating] in your opinion if he was intoxicated?

A.    If a person with this degree of brain damage was intoxicated to the point that Dr. Lipman says that he lived in a constant state of, you know, in his report—but, again, I am—I am basing my answer on something that isn't–.

Q.    No, no.

A.    –my knowledge.

Q.    I guess the thing is presuming that he was intoxicated and given the background of all these other things that you've found would he be incapable of forming an intent? . . . Not that it affected him but would he be incapable of forming the intent or to premeditate? You said it diminished his ability. You said it could have impaired his ability. All that is fine. I'm just trying to see if you have an opinion. You may not, I don't know.

A.    I mean, as I stated, you know, earlier, if I had evidence—if I had

-10-

strong evidence, you know, so the if is if—

Q.     Not looking at the if.

A.     Right.

Q.     I'm looking at the incapability.

A.     Right.  I understand that.  The only reason that I say "could" is that I wasn't there and I don't have the data.

. . . .

Q.     So if he wasn't, though, intoxicated and all you have is all the other things [regarding his mental diseases and defects], would he be incapable of [premeditating]?  Incapable is the term I'm looking at.

A.     You know, I think it would be easier for him to make a better judgment and to be able to, you know—I mean, a little bit reason through what he was going to do on a day that he was not inebriated.

Following the hearing, the trial court entered an order on June 16, 2014, granting the State's motion to exclude the testimony of Dr. Rich and Dr. Lipman regarding Wilson's mental diseases, defects, or other mental conditions bearing on the issue of his guilty for first degree premeditated murder.  The trial court found that Dr. Lipman was unable to testify that Wilson suffered from a mental disease or defect.  It noted Dr. Lipman's opinion that only a person who was unconscious would be unable to act intentionally and with premeditation and that Wilson did not meet this standard.  The court also found that neither Dr. Lipman nor Dr. Rich "stat[ed] conclusively that a mental disease or defect rendered [Wilson] incapable of acting intentionally and with premeditation in this case."  The trial court cited the following three instances where Dr. Rich testified that Wilson's mental diseases or defects made him incapable of forming the requisite mental state for the offense:

During direct examination:

Q.     . . . Do you think that he lacked the capacity to form the requisite culpable mental state to commit the offense charged in this case?

A.     I do.

-11-

During cross-examination:

Q.  Now, let me—just looking at your report you're not saying that he's absolutely incapable of premeditation because of mental disease or defect, are you?

A.  At any given time on a day that he's not also intoxicated and using ecstasy and everything else, but on the day of this event I do believe he was [incapable of premeditation].

On questioning by the trial court:

Q.  [R]eading your report it says if he was intoxicated. Now, let's do that one first. If he was intoxicated, it could have impacted or affected his ability to premeditate or to form the intent; is that right? It could have?

A.  (Witness moves head up and down [in the affirmative].)

Q.  Are you saying that it did or that it completely eroded his ability to do that?

A.  If he was [intoxicated].

Q.  Okay. But if he was [intoxicated]. But would it have completely made him incapable of [forming premeditation or intent]?

A.  In my clinical opinion I believe so.

Q.  But that's not what your report says.

A.  Well, my report—

Q.  The report says it could have [impaired his ability to act with premeditation in the murder]—and you just testified it could have impacted [his ability to premeditate or to form intent]. If he was intoxicated, it could have. That's different than the question just asked you. Would it have made him incapable of [premeditating the murder]?

A.  So this is why I wrote "could have" because I was not there.

-12-

The trial court noted that "while in the three isolated instances outlined above Dr. Rich did state that the defendant's fetal alcohol syndrome-related disorders did constitute a mental disease or defect that rendered the defendant wholly unable to form the requisite mental state, the overwhelming majority of her testimony reflected the conclusions she reached in her report; the defendant's mental deficits, combined with intoxication (if the defendant was in fact intoxicated) may well have substantially impaired the defendant's ability to premeditate, act intentionally, and understand the consequences of his actions." The court found that the expert testimony in this case was similar to the expert testimony in State v. Faulkner, 154 S.W.3d 48, 56-57 (Tenn. 2005), State v. Antonio D. Idellfonso-Diaz, No. M2006-00203-CCA-R9-CD, 2006 WL 3093207 (Tenn. Crim. App. Nov. 1, 2006), and State v. Tray Dontacc Chaney, No. W2013-00914-CCA-R9-CD, 2014 WL 2016655 (Tenn. Crim. App. May 14, 2014), perm. app. denied (Tenn. Sept. 18, 2014), in that Dr. Lipman's and Dr. Rich's testimony fell short of stating that Wilson was "completely unable to form the requisite mental state" because of a mental disease or defect as required by State v. Hall, 958 S.W.2d 679 (Tenn. 1997).

On July 16, 2014, Wilson filed a motion for an appeal pursuant to Tennessee Rule of Appellate Procedure 9, which the trial court granted on July 24, 2014. After obtaining a thirty-day extension of time to file an application for an interlocutory appeal, Wilson timely filed his application on September 3, 2014, and this court granted the application for a Rule 9 interlocutory appeal.

## ANALYSIS

In this interlocutory appeal, Wilson argues that his expert testimony is admissible during the guilt/innocence phase of trial because it meets the standard for admissibility in State v. Hall, State v. Ferrell, and State v. Tray Dontacc Chaney. The pretrial hearing that resulted in the court's interlocutory order, Wilson's Rule 9 application, and Wilson's appellate brief contain no arguments regarding his competency to stand trial or whether he will pursue an insanity or intoxication defense. Although Wilson contends that his mental diseases and defects, along with his intoxication at the time of the offense, negated his capacity to form the requisite mental states for the offense, he has limited his argument to Hall and its progeny from the pretrial hearing forward and has failed to reference any authority or make any arguments regarding a voluntary intoxication defense. See Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7). Much of the expert testimony in this case applies not only to Wilson's capacity to form the requisite mental state for the offense because of a mental disease or defect but also to potential issues regarding his competency to stand trial, his sanity, and his voluntary intoxication at the time of the offense. Nevertheless, because Wilson has failed to include any arguments or authority regarding his competency to stand trial or an insanity

-13-

or intoxication defense, these issues are not properly before this court. See State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997) (citing State v. Hammons, 737 S.W.2d 549, 552 (Tenn. Crim. App. 1987)).

Herein, Wilson contends that the trial court abused its discretion in excluding Dr. Lipman's and Dr. Rich's testimony because this testimony meets the standard for admissibility outlined in State v. Hall, State v. Ferrell, 277 S.W.3d 372 (Tenn. 2009), and State v. Tray Dontacc Chaney. Referencing Dr. Rich's testimony on direct and cross-examination, he asks this court to consider whether Hall stands for the proposition that an expert's testimony is wholly inadmissible at trial "if upon cross-examination, the mental health expert provides any arguably conflicting testimony on the question of the absolute inability of the defendant to form the requisite mental state." Alternatively, he asks this court to consider "whether due process, in the context of a capital case, warrants that the defense be allowed to introduce proof negating intent and premeditation, regardless of whether the proof is an absolute inability to form the requisite mental state, or a matter of degree of that inability." As support, Wilson asserts that "[i]t appears . . . absent a person being unconscious on one end of the spectrum or legally insane at the other end of the spectrum (resulting in an outright not guilty verdict at either end), that a defendant is not able to present proof negating intent and premeditation."

Because Wilson's issue regarding his due process right to present a defense was not presented to the trial court or considered in the trial court's order, which is the basis for this appeal, it is not properly before this court. See Tray Dontacc Chaney, 2014 WL 2016655, at *9 (concluding that the defendant's new arguments regarding pattern jury instructions and due process rights associated with the admissibility of expert testimony could not be raised on appeal because they were not "not made by the defendant in the proceedings before the trial court or ruled upon by that court"). Therefore, the only issue on appeal is whether the expert testimony in this case meets the standard of admissibility set out in Hall, Ferrell, and Tray Dontacc Chaney.

As we will explain, we are constrained to conclude that the trial court did not abuse its discretion in granting the State's motion to exclude Dr. Lipman's and Dr. Rich's testimony from the guilt/innocence phase of trial. However, we express our concern regarding the controlling authority that requires us to reach this decision. First, Hall and its progeny create an almost impossible standard of admissibility for such expert testimony. Because almost no experts testifying in good faith can meet this standard, we fully acknowledge that many defendants are deprived of presenting the only meaningful defense they have to the crime. But see State v. Brown, 29 S.W.3d 427, 432 (Tenn. 2000) (asserting that while the right to present witnesses in defense is of great importance, it is not absolute and must yield to other legitimate interests in the criminal trial process, including compliance with established rules of procedure and evidence that

assure fairness and reliability in the determination of guilt and innocence); State v. Anthony Poole, No. W2007-00447-CCA-R3-CD, 2009 WL 1025868, at *10 (Tenn. Crim. App. Apr. 14, 2009) ("Even considering the accused's right to present a defense, the testimony offered by the witness [regarding the defendant's capacity to form the requisite mental state because of a mental disease or defect] must be relevant, reliable, and material" (citing Brown, 29 S.W.3d at 434)). We further acknowledge that this standard essentially requires defendants to prove that they are insane, or as Wilson argues, unconscious, before being allowed to present expert testimony during the guilt/innocence phase regarding their capacity to form the requisite mental state. See Tray Dontacc Chaney, 2014 WL 2016655, at *3 (psychologist testified that it would be very difficult for any expert to testify that a defendant completely lacked the capacity to premeditate unless the defendant had a severe level of psychosis resulting in a disconnect with reality, which would make him borderline insane). It is our belief that evidence affecting the defendant's capacity to form the requisite mental state is relevant and should be considered and weighed by the jury during the guilt/innocence phase of trial. Nevertheless, as in all cases before this court, we are bound to follow existing precedent.

Expert evidence negating the requisite culpable mental state for an offense is subject to the relevancy standards in Rules 401 through 403 and the standards for expert testimony in Rules 702 and 703 of the Tennessee Rules of Evidence. See Hall, 958 S.W.2d at 689. In Hall, the Tennessee Supreme Court held that assuming that the aforementioned general relevancy standards and standards governing expert testimony are satisfied, "psychiatric evidence that the defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged is admissible under Tennessee law." Id.; see Ferrell, 277 S.W.3d at 379. This standard is predicated on the fundamental right of due process that "[n]o person may be convicted of an offense unless . . . [t]he culpable mental state required is proven beyond a reasonable doubt." Hall, 958 S.W.2d at 689 (quoting T.C.A. § 39-11-201(a)(2)). The court stressed that the defendant's inability to form the requisite culpable mental state had to be the product of a mental disease or defect, rather than an emotional state or mental condition:

> [W]e emphasize that the psychiatric testimony must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect, not just a particular emotional state or mental condition. It is the showing of lack of capacity to form the requisite culpable mental intent that is central to evaluating the admissibility of expert psychiatric testimony on the issue.

Hall, 958 S.W.2d at 690 (citing State v. Shelton, 854 S.W.2d 116, 122 (Tenn. Crim. App. 1992); see Faulkner, 154 S.W.3d at 56-57. While the use of such evidence is not a defense to a crime, it is a rule of evidence that allows proof of the defendant's mental disease or defect to negate the requisite culpable mental state:

> The rule of diminished capacity originated in Scotland more than a century ago and was designed "to reduce the punishment of the 'partially insane' from murder to culpable homicide, a non-capital offense." State v. Wilcox, 70 Ohio St.2d 182, 436 N.E.2d 523, 525 (1982). The doctrine was widely accepted in other countries before it gained acceptance in American jurisdictions. Id. In modern application, diminished capacity is not considered a justification or excuse for a crime, but rather an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but most likely guilty of a lesser included offense. United States v. Cameron, 907 F.2d 1051, 1067 (11th Cir. 1990). Thus, a defendant claiming diminished capacity contemplates full responsibility, but only for the crime actually committed. State v. Padilla, 347 P.2d 312 (N.M. 1959). In other words, "diminished capacity" is actually a defendant's presentation of expert, psychiatric evidence aimed at negating the requisite culpable mental state. "Properly understood, it is . . . not a defense at all but merely a rule of evidence." United States v. Pohlot, 827 F.2d 889, 897 (3rd Cir. 1987).

Hall, 958 S.W.2d at 688-89. The court asserted that such evidence should not be offered as proof of diminished capacity; instead, it should be presented as evidence relevant to negate the existence of the culpable mental state required for the offense. Id. at 690.

Although proof that a defendant lacked the capacity to form the requisite mental state because of a mental disease or defect is admissible, expert testimony regarding a personality type is not relevant to the defendant's capacity to form the mental state of the offense and is, therefore, inadmissible:

> "Society is comprised of myriad individuals with diverse personalities and temperaments who are jointly and severally bound by society's common codes of conduct and responsibility. The mere fact that one is more apt, by personality type, to become emotional in response to a particular stimulus does not provide a means for that person to be absolved from the same responsibility to which the law holds another who might be less apt to respond as passionately to the same stimulus. If it did, then each person would be the law unto him or herself based solely upon his or her particular personality makeup."

Id. at 691-92 (quoting State v. Leroy Hall, Jr., No. 03C01-9303-CR-00065, 1996 WL 740822, at *18 (Tenn. Crim. App., at Knoxville, Dec. 30, 1996)). Therefore, an expert offering evidence to negate a requisite culpable mental state must show: (1) the defendant had a mental disease or defect, and (2) the defendant's inability to form the requisite culpable mental state was because of the defendant's mental disease or defect, rather than the defendant's emotional state or mental condition. See Hall, 958 S.W.2d at 689-90; Faulkner, 154 S.W.3d at 56-57.

An expert's testimony in the form of an opinion is not objectionable merely because it concerns an ultimate issue to be determined by the trier of fact. See State v. Shuck, 953 S.W.2d 662, 668-69 (Tenn. 1997) (citing City of Columbia v. C.F.W. Const. Co., 557 S.W.2d 734, 742 (Tenn. 1977)); see also Tenn. R. Evid. 704. "In Tennessee the only ultimate issue about which an expert explicitly cannot offer an opinion is whether the defendant was or was not sane at the time of commission of the criminal offense." Shuck, 953 S.W.2d at 663 n.3 (citing T.C.A. § 39-11-501(c)). Therefore, it is appropriate for experts to testify regarding the ultimate issue in a case in which the defendant's mental disease or defect prevented him from acting intentionally, knowingly, recklessly or with premeditation. See State v. Robert Austin, No. W2005-01963-CCA-R3-CD, 2007 WL 2624399, at *5 (Tenn. Crim. App. Sept. 10, 2007).

In State v. Ferrell, 277 S.W.3d at 377, the court considered whether the trial court abused its discretion in excluding the testimony of Dr. Adams, a family medicine physician, regarding the defendant's capacity to form the mental state required for escape—intentional, knowing, or reckless. At a pre-trial hearing, Dr. Adams testified that the defendant, who suffered from a condition of organic brain syndrome, was not "competent to intentionally commit a crime that requires [any degree of] planning . . ." and was unaware of "the full consequences of [his] action." Id. at 380-81. The trial court excluded this expert testimony from trial based on its mistaken belief that a jury could not consider testimony regarding a defendant's capacity to form the requisite mental state in a "non-specific intent crime." Id. at 376. In considering this case, the supreme court reiterated that the admissibility of expert testimony largely rests within the discretion of the trial court, and a trial court's ruling on appeal will not be overturned absent a finding that it had abused its discretion. Id. at 378 (citing State v. Copeland, 226 S.W.3d 287, 301 (Tenn. 2007); State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993)). However, it asserted that "[n]othing in Hall limited its application to psychiatric testimony or specifically precluded other forms of expert testimony regarding a defendant's capacity to form a requisite mental state." Id. at 379. Moreover, it concluded that it was improper "to distinguish between specific and general intent offenses or otherwise limit a defendant's ability to negate an element of the offense." Id. at 380. Consequently, it held that the trial court abused its discretion by excluding Dr. Adam's testimony:

This testimony from a long-term medical provider directly addressed whether the Defendant acted intentionally, knowingly, or recklessly as required to commit escape, an essential element of the crime. . . . Unlike the Court of Criminal Appeals, we view Dr. Adams' testimony as probative on each of the alternative mental states required to support the offense of escape. The evidence should have been considered by the jury. Moreover, the exclusion of the testimony divested the Defendant of any real opportunity to present his only meaningful defense to the crime. Because the error more likely than not affected the result, a new trial is the appropriate remedy. See Rodriguez, 254 S.W.3d at 378.

Id. at 380.

It is well established that a mental disease or defect that impairs or reduces a defendant's capacity to form the requisite culpable mental state for the offense does not satisfy the two-prong test under Hall. See Tray Dontacc Chaney, 2014 WL 2016655, at *9 (concluding that the testimony from a psychologist, who opined that the defendant's psychological problems "eroded his capacity to premeditate" but who could not state that that the defendant's capacity to do so "was completely eroded," was inadmissible under Hall); State v. Herbert Michael Merritt, No. E2011-01348-CCA-R3-CD, 2013 WL 1189092, at *27 (Tenn. Crim. App. Mar. 22, 2013) (holding that a clinical psychologist's testimony that the defendant's mental disease or defect "impaired or reduced his capacity to form the requisite mental state . . . did not satisfy the two-prong requirement of Hall and Faulkner"); Anthony Poole, 2009 WL 1025868, at *11 (concluding that the testimony from a clinical psychologist, who stated that the defendant's mental defects impacted his capacity to form the requisite mental state for the offense, was irrelevant and inadmissible pursuant to Hall); Antonio D. Idellfonso-Diaz, 2006 WL 3093207, at *4 (holding that a psychiatrist's testimony that the defendant's serious psychiatric disorders "impaired to some extent" his capacity to premeditate or act intentionally did not meet the two-prong requirement in Hall and Faulkner).

In this case, the trial court noted that Dr. Lipman was unable to testify that Wilson suffered from a mental disease or defect. In granting the State's motion to exclude this testimony, it found that neither Dr. Lipman nor Dr. Rich "stat[ed] conclusively that a mental disease or defect rendered [Wilson] incapable of acting intentionally and with premeditation in this case." Specifically, the trial court held that because the experts in this case did not testify that Wilson was "completely unable to form the requisite mental state," their testimony was inadmissible under Hall. Interestingly, the court noted that the proposed testimony of Dr. Lipman and Dr. Rich could potentially relate to an intoxication defense. See T.C.A. § 39-11-503(a); Wiley v. State, 183 S.W.3d 317, 333 (Tenn. 2006);

-18-

Compare T.P.I.—Crim. § 40.02 Defense: Intoxication (2014), with T.P.I.—Crim. § 42.22 Evidence of mental state (2014). However, because Wilson's Rule 12.2 notice and the State's motion that were the subject of the court's order did not specifically address the issue of an intoxication defense and whether the expert testimony was relevant and admissible regarding such a defense, the court declined to address that issue in its order.

Wilson contends that the trial court abused its discretion in excluding Dr. Lipman's and Dr. Rich's testimony because this testimony met the standard for admissibility established in Hall, Ferrell, and Tray Dontacc Chaney. Focusing on Dr. Rich's testimony, he questions whether Hall stands for the proposition that an expert's testimony is wholly inadmissible at trial "if upon cross-examination, the mental health expert provides any arguably conflicting testimony on the question of the absolute inability of the defendant to form the requisite mental state."

Wilson is charged with first degree premeditated murder, which is defined as "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). See id. § 39-13-202(a)(1). Premeditation is defined as "an act done after the exercise of reflection and judgment." Id. § 39-13-202(d). "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Id. § 39-11-302(a). In order for their testimony to be admissible at trial, Dr. Lipman and Dr. Rich had to testify that Wilson suffered from a mental disease or defect that rendered him incapable of premeditating the victim's death or acting intentionally in killing the victim.

We conclude that Dr. Lipman's testimony did not satisfy the test in Hall. He stated that he was precluded from testifying that Wilson suffered from a mental disease or defect because he was not a psychiatrist or psychologist. Dr. Lipman asserted his belief that an individual would have to be unconscious to be incapable of having a culpable mental state and that Wilson was not unconscious at the time of the offense. Consequently, he never testified that Wilson was incapable of premeditating the victim's death or acting intentionally in killing the victim. Instead, Dr. Lipman opined that Wilson's ability to premeditate the victim's killing was "dramatically impaired" and that his ability to think clearly, formulate plans, and understand consequences was "degrade[d]." Because Dr. Lipman's testimony did not establish that Wilson lacked the capacity to form the requisite mental states because of a mental disease or defect, his testimony did not satisfy the Hall test. Therefore, the trial court did not abuse its discretion in excluding it from the guilt/innocence phase of trial.

We also conclude that Dr. Rich's testimony did not satisfy the test in Hall. While Dr. Rich did testify that Wilson suffered a mental disease or defect, she failed to conclusively testify that Wilson lacked the capacity to premeditate or act intentionally at

-19-

the time of the killing. As noted by the trial court, Dr. Rich testified in three isolated instances that Wilson lacked the capacity to form the requisite mental states; however, at all other times during her testimony, Dr. Rich opined that Wilson's mental diseases or defects "could have impaired" or "impaired" his capacity to form the requisite mental states for the offense. In her report, Dr. Rich opined that Wilson's mental diseases or defects "could have impaired his ability to act with premeditation" in the victim's murder and that if Wilson was intoxicated, it was "even more likely that his ability to act with premeditation in the commission of that offense was impaired." When the trial court specifically and repeatedly questioned Dr. Rich about the disparity between her three isolated instances of testimony and the opinions in her report, Dr. Rich testified that she could only opine that Wilson's mental diseases or defects could have impaired his ability to premeditate because she did not observe Wilson at the time of the offense. We note that the standard in Hall "was designed to ensure that the testimony regarding a defendant's mental state is relevant to negate the existence of the requisite mental state." Anthony Poole, 2009 WL 1025868, at *11. Accordingly, any equivocation in an expert's testimony falls short of negating the existence of the requisite culpable mental state. The fact that Wilson's mental diseases or defects could have impaired or did, in fact, impair his capacity to form the requisite culpable mental states for the offense does not meet the two-prong test in Hall, and the trial court did not abuse its discretion in granting the State's motion to exclude Dr. Rich's testimony. Because the testimony from both Dr. Lipman and Dr. Rich failed to establish that Wilson lacked the capacity to form the requisite culpable mental states because of a mental disease or defect, we must conclude, based on established precedent, that the trial court did not abuse its discretion in excluding it from the guilt/innocence phase of trial.

## CONCLUSION

Based upon the above authorities and reasoning, we affirm the June 16, 2014 order of the trial court and remand this matter for further proceedings consistent with this opinion.

_____
CAMILLE R. McMULLEN, JUDGE

-20-