IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 19, 2018 Session

## STATE OF TENNESSEE v. LESERGIO DURAN WILSON

**Appeal from the Criminal Court for Davidson County**
No. 2010-B-1227    Cheryl A. Blackburn, Judge

———————————————————

**No. M2017-01950-CCA-R3-CD**

———————————————————

A Davidson County grand jury indicted Lesergio Duran Wilson, the defendant, with first degree premeditated murder as a result of the death of David Hurst, the victim. Following trial, the jury returned a guilty verdict, for which the defendant received a life sentence.  On appeal, the defendant challenges the trial court's exclusion of his experts, denial of his motion to recuse the trial court, admission of certain photographic evidence, admission of evidence related to the actions of the victim's girlfriend following his death, jury instructions regarding the use of deceptive practices by law enforcement, and imposition of a consecutive sentence.  Discerning no errors, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J. and TIMOTHY L. EASTER, J., joined.

Paul Bruno, Memphis, Tennessee, for the appellant, Lesergio Duran Wilson.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Pamela Anderson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### *Facts and Procedural History*

This case involves a murder for hire scheme in which the defendant is the shooter. Early in the morning of October 14, 2009, the defendant and his girlfriend, Alicia Nicole Williams, entered the trailer the victim resided in with his girlfriend, Doris Ann Williams.

Prior to their arrival, the victim's girlfriend attempted to stage a break-in by strewing items around the trailer. While the defendant's girlfriend kept watch in the common area, the defendant walked to the back bedroom and shot the victim, who was in bed sleeping, in the head with a revolver. The victim's girlfriend paid the defendant cash. In furtherance of their plan and scheme, the defendant sprayed the victim's girlfriend with mace, and the defendant and his girlfriend left in the black Buick. The victim's girlfriend then ran to the neighbor's residence to report the invasion, and the police were notified.

Detective Jack Stanley with the Metropolitan Nashville Police Department, responded to the emergency call. When he arrived, the victim was not breathing and appeared to have been shot multiple times in the side of the head. The trailer was in disarray, and he could smell pepper spray. He helped secure the scene as officers collected evidence, including bullet jackets and a throw pillow with bullet holes, and took photographs of the scene. The victim's body was transported to the State of Tennessee Center for Forensic Medicine, where following autopsy, the medical examiner determined the cause of death to be multiple gunshot wounds of the head and torso and the manner of death to be homicide. A bullet fragment and hollow point bullet were removed from the defendant's body and secured as evidence.

Agent Alex Broadhag, a firearms examiner with the Tennessee Bureau of Investigation ("TBI"), analyzed the bullet casings recovered from the crime scene and the bullet taken from the victim's body and determined they had all been fired through the revolver found on the floorboard of the defendant's girlfriend's car. Agent Shelley Betts, a forensic scientist and firearms identification expert with the TBI, analyzed the pillow taken from the crime scene for gunshot residue and found "[r]esidues and characteristics . . . on the solid side of the pillow which [were] consistent with those produced when a firearm is discharged while in contact, or near contact with an object," and "[r]esidues . . . on the printed side of the pillow which [were] consistent with the passage of a projectile."

On April 16, 2010, Officer Marty Reed with the Metro Nashville Police Department stopped a light blue sedan driven by the defendant's girlfriend. The defendant was in the front passenger seat, and there was a loaded revolver in plain view on the front passenger side floorboard. Both the defendant and the defendant's girlfriend were apprehended. When questioned following his arrest, the defendant confessed to his role in the shooting. This Court previously summarized the defendant's statement as follows:

> Following his apprehension, [the defendant] admitted to police that he fired
> the shots after [the victim's girlfriend] offered to pay him $1,000.00 to kill
> [the victim], who she claimed had been abusing her. Less than twenty-four
> hours prior to the shooting, [the defendant] stole a vehicle that he and his

girlfriend later drove to [the victim's girlfriend's] trailer. He brought a gun and rubber gloves with him to the scene of the shooting. When [the defendant] arrived at [the victim's girlfriend's] home, he sat in the stolen vehicle for a short time before entering the unlocked front door of the trailer. He walked into the bedroom, placed a pillow over [the victim], and shot [the victim] multiple times through the pillow, ostensibly for the purpose of reducing the sound of the gunshots. Before [the defendant] arrived, [the victim's girlfriend] staged the trailer to look as if a robbery had occurred. After the shooting, [the victim's girlfriend] gave [the defendant] more than $500 dollars but less than the $1000 they had agreed upon, and she asked [the defendant] to spray her in the face with a can of mace to make the staged robbery look more believable, which he did. He then fled the trailer and abandoned the stolen vehicle near the Percy Priest Dam.

*State v. Lersergio Duran Wilson*, No. 2014-01487-CCA-R9-CD, 2015 WL 5170970, at *1 (Tenn. Crim. App. Sept. 2, 2015), *perm. app. denied* (Tenn. Dec. 10, 2015). In addition, the defendant admitted that sometime after the shooting, the victim's girlfriend gave him speakers for his car that did not fit, so he pawned them for approximately $100.00.

Prior to trial, the defendant filed a motion to recuse the trial judge because he previously presided over a trial that resulted in a guilty conviction against the defendant for felony first degree murder and especially aggravated robbery. The jury imposed a sentence of life imprisonment for the first degree murder conviction, and the trial court imposed a sentence of twenty-five years of incarceration for the especially aggravated robbery conviction. When ordering the sentences to run consecutively, the trial court noted not only the heinous nature of the crimes for which the defendant was being sentenced, but also the defendant's execution-style murder of the victim in the present matter. Upon hearing the guilty verdict and subsequent effective sentences of life in prison plus twenty-five years, the defendant had a series of emotional and profane outbursts that included calling the trial court names like "b****" and "mother-f*****" and statements like, "F*** that trial. F*** the next trial. I'm cool, cool, cool." In his motion to recuse the trial court, the defendant argued the trial court's prior knowledge of the facts of this matter and its observation of the defendant's outbursts at his prior trial would make it impossible for the trial court to render unbiased and impartial rulings. The trial court denied the motion. The defendant filed an expedited interlocutory appeal, and this Court upheld the trial court's ruling. *See State v. Lesergio Duran Wilson*, No. M2013-00306-CCA-10B-CD, 2013 WL 543862 (Tenn. Crim. App. Feb. 13, 2013).

Following remand, the defendant filed a notice of intent to introduce the expert testimony of Dr. Susan Rich and Dr. Jonathan Lipman during the guilt phase of trial. Dr.

Lipman, a neuropharmacologist, was to opine regarding the defendant's underlying susceptibility to drug and alcohol addiction, his history of substance abuse, and the impact that history would have had on the defendant the day of the murder and at the time the defendant gave his statement to the police. Dr. Rich, a neuropsychiatrist who evaluated the defendant, was to explain her diagnosis of Neurodevelopmental Disorder Associated with Prenatal Alcohol Exposure ("ND-PAE") and opine as to the manner in which this disorder would have contributed to the defendant's mental state at the time of the victim's death. The State filed a motion to exclude both experts, arguing their opinions were speculative and unreliable. Following an evidentiary hearing during which the trial court heard the proposed testimony of both experts, the trial court granted the motion. The trial court allowed the defendant to file an application for interlocutory appeal to this Court, and we accepted it. *See State v. Lesergio Duran Wilson*, No. M2014-01487-CCA-R9-CD, 2015 WL 5170970 (Tenn. Crim. App. Sept. 2, 2015), *perm. app. denied* (Tenn. Dec. 10, 2015),

On interlocutory appeal, the defendant argued the trial court erred when granting the State's motion to exclude Dr. Lipman and Dr. Rich because their proffered testimony met the standard for admissibility set forth in *State v. Hall*, 958 S.W.2d 679 (Tenn. 1997), *State v. Ferrell*, 277 S.W.3d 372 (Tenn. 2009), and *State v. Tray Dontacc Chaney*, No. W2013-00914-CCA-R9-CD, 2014 WL 2016655 (Tenn. Crim. App. May 14, 2014), *perm. app. denied* (Tenn. Sept. 18, 2014). *Lesergio Duran Wilson*, 2015 WL 5170970 at *8. After carefully considering the testimony rendered by both experts during the evidentiary hearing and the trial court's subsequent ruling, this Court concluded the trial court did not abuse its discretion because neither Dr. Lipman nor Dr. Rich could establish that due to a mental disease or defect, the defendant lacked the capacity to premeditate. *Id*. at *13. Therefore, pursuant to *Hall* and its progeny, their proffered testimony did not meet the standard for admissibility. *Id*. We remanded the matter, and it proceeded to trial. *Id*. at *14.

At trial, the State presented extensive evidence of the investigation into the victim's death that was consistent with the foregoing. In addition, the State called David Wind, the owner of Hy's Pawn Shop, Inc., and Eulaine Johnson, a former employee of Cash America Pawn of Nashville, to testify regarding items pawned by the victim's girlfriend on November 9, 2009, December 11, 2009, and January 12, 2010, to corroborate the defendant's confession that the victim's girlfriend offered to pay him $1000.00 to kill the victim. Ms. Johnson testified that she was working at Cash America Pawn November 9, 2009, and December 11, 2009. The victim's girlfriend came in both dates. On November 9, 2009, the victim's girlfriend brought in two rings and received $27.00 in cash for both. When the victim's girlfriend returned on December 11, 2009, she brought in a black toaster and received a $20.00 loan. Mr. Wind testified that the victim's girlfriend brought a ring into his pawnshop on January 12, 2010, and he bought

- 4 -

it outright for $52.00. The State did not present any evidence that this money was actually given to the defendant.

The defendant did not present any evidence on his behalf. After being charged and hearing closing arguments, the jury found the defendant guilty of first degree premediated murder. After a sentencing hearing, the defendant received a sentence of life imprisonment with the possibility of parole. The trial court ordered this sentence run consecutively to the sentence of life in prison plus twenty-five years that the defendant was already in the process of serving. The defendant subsequently filed a motion for new trial which was denied, and this timely appeal followed.

*Analysis*

I.      **Exclusion of Expert Witnesses**

The defendant first contends the trial court erred when granting the State's motion to exclude experts during the guilt phase of trial. However, as pointed out by the State, this Court previously resolved this issue in *Lesergio Duran Wilson*, 2015 WL 5170970, making it the law of the case. *See State v. Odom*, 336 S.W.3d 541, 563-64 (Tenn. 2011) (holding, "'an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal'") (quoting *Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998). As he does now, the defendant argued in his prior appeal that the trial court erred when granting the State's motion because the expert testimony he wished to introduce during the guilt phase of trial through Dr. Lipman and Dr. Rich met the standards for admissibility set forth in *State v. Hall*, 958 S.W.2d 679 (Tenn. 1997), *State v. Ferrell*, 277 S.W.3d 372 (Tenn. 2009), and *State v. Tray Dontacc Chaney*, No. W2013-00914-CCA-R9-CD, 2014 WL 2016655 (Tenn. Crim. App. May 14, 2014), *perm. app. denied* (Tenn. Sept. 18, 2014). When previously considering this issue, this Court found:

> [The defendant] contends that the trial court abused its discretion in excluding Dr. Lipman's and Dr. Rich's testimony because this testimony met the standard for admissibility established in *Hall*, *Ferrell*, and *Tray Dontacc Chaney*. Focusing on Dr. Rich's testimony, he questions whether *Hall* stands for the proposition that an expert's testimony is wholly inadmissible at trial "if upon cross-examination, the mental health expert provides any arguably conflicting testimony on the question of the absolute inability of the defendant to form the requisite mental state."

- 5 -

[The defendant] is charged with first degree premeditated murder, which is defined as "[a] premeditated and intentional killing of another." T[enn]. C[ode] A[nn]. § 39-13-202(a)(1). *See id*. § 39-13-202(a)(1). Premeditation is defined as "an act done after the exercise of reflection and judgment." *Id*. § 39-13-202(d). "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id*. § 39-11-302(a). In order for their testimony to be admissible at trial, Dr. Lipman and Dr. Rich had to testify that [the defendant] suffered from a mental disease or defect that rendered him incapable of premeditating the victim's death or acting intentionally in killing the victim.

We conclude that Dr. Lipman's testimony did not satisfy the test in *Hall*. He stated that he was precluded from testifying that [the defendant] suffered from a mental disease or defect because he was not a psychiatrist or psychologist. Dr. Lipman asserted his belief that an individual would have to be unconscious to be incapable of having a culpable mental state and that [the defendant] was not unconscious at the time of the offense. Consequently, he never testified that [the defendant] was incapable of premeditating the victim's death or acting intentionally in killing the victim. Instead, Dr. Lipman opined that [the defendant's] ability to premeditate the victim's killing was "dramatically impaired" and that his ability to think clearly, formulate plans, and understand consequences was "degrade[d]." Because Dr. Lipman's testimony did not establish that [the defendant] lacked the capacity to form the requisite mental states because of a mental disease or defect, his testimony did not satisfy the *Hall* test. Therefore, the trial court did not abuse its discretion in excluding it from the guilt/innocence phase of trial.

We also conclude that Dr. Rich's testimony did not satisfy the test in *Hall*. While Dr. Rich did testify that [the defendant] suffered a mental disease or defect, she failed to conclusively testify that [the defendant] lacked the capacity to premeditate or act intentionally at the time of the killing. As noted by the trial court, Dr. Rich testified in three isolated instances that [the defendant] lacked the capacity to form the requisite mental states; however, at all other times during her testimony, Dr. Rich opined that [the defendant's] mental diseases or defects "could have impaired" or "impaired" his capacity to form the requisite mental states for the offense. In her report, Dr. Rich opined that [the defendant's] mental diseases or defects "could have impaired his ability to act with

premeditation" in the victim's murder and that if [the defendant] was intoxicated, it was "even more likely that his ability to act with premeditation in the commission of that offense was impaired." When the trial court specifically and repeatedly questioned Dr. Rich about the disparity between her three isolated instances of testimony and the opinions in her report, Dr. Rich testified that she could only opine that [the defendant's] mental diseases or defects could have impaired his ability to premeditate because she did not observe [the defendant] at the time of the offense. We note that the standard in *Hall* "was designed to ensure that the testimony regarding a defendant's mental state is relevant to negate the existence of the requisite mental state." [*State v.*] *Anthony Poole*, [No. W2007-00447-CCA-R3-CD], 2009 WL 1025868, at *11 [(Tenn. Crim. App. Sept. 28, 2009), *perm. app. denied* (Tenn. Sept. 28, 2009)]. Accordingly, any equivocation in an expert's testimony falls short of negating the existence of the requisite culpable mental state. The fact that [the defendant's] mental diseases or defects could have impaired or did, in fact, impair his capacity to form the requisite culpable mental states for the offense does not meet the two-prong test in *Hall*, and the trial court did not abuse its discretion in granting the State's motion to exclude Dr. Rich's testimony. Because the testimony from both Dr. Lipman and Dr. Rich failed to establish that [the defendant] lacked the capacity to form the requisite culpable mental states because of a mental disease or defect, we must conclude, based on established precedent, that the trial court did not abuse its discretion in excluding it from the guilt/innocence phase of trial.

*Lesergio Duran Wilson*, 2015 WL 5170970, at *12-13.

It is well-settled that the law of the case doctrine "applies to issues that were actually before the appellate court in the first appeal and to issues that were necessarily decided by implication." *Memphis Publ'g Co.*, 975 S.W.2d at 306. There is no doubt the defendant argued during his prior appeal that the trial court erred when granting the State's motion to exclude the testimony of Dr. Rich and Dr. Lipman, and this Court concluded the argument lacked merit. While there are exceptions to this doctrine, they do not apply here. Appellate courts may only reconsider an issue decided in a previous appeal of the same case when:

(1) the evidence offered at a trial or hearing after remand was substantially different from the evidence in the initial proceeding; (2) the prior ruling was clearly erroneous and would result in a manifest injustice if allowed to stand; or (3) the prior decision is contrary to a change in the controlling law which has occurred between the first and second appeal.

*Id.* at 306. The defendant has not raised one of these exceptions on appeal, and based on our review of the record and applicable authority, they do not apply. The defendant's argument that the trial court erroneously precluded Dr. Rich and Dr. Lipman from testifying during the guilt phase of trial is barred by the law of the case doctrine, so the defendant is not entitled to relief on this matter.

## II.     Motion to Recuse Trial Court

The defendant next asserts the trial court erred when denying his motion to recuse the trial court, finding no objective basis for recusal. The defendant admits he previously raised this issue on accelerated interlocutory appeal and states he raises it again on direct appeal to preserve it for potential appeal to the Supreme Court of Tennessee. The law of the case doctrine also bars our consideration of this issue.

In his prior accelerated interlocutory appeal, this Court provided the following procedural background:

> The [defendant] has been indicted for premeditated first degree murder in this case (2010-B-1227). He was also indicted for felony first degree murder and especially aggravated robbery in a separate case (2010-C-1912). The State elected to try the [defendant] in case 2010-C-1912 first, and the [defendant] was convicted by a jury of the charged offenses. The trial court sentenced the [defendant] to life plus twenty-five years.

*Lesergio Duran Wilson*, 2013 WL 543862 at *1.

The trial court imposed consecutive sentences in case 2010-C-1912 after finding the defendant was "'a dangerous offender whose behavior indicate[d] little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high.'" *Id.* (quoting Tenn. Code Ann. § 40-35-115(b)(4)). In support of its finding, the trial court referenced the statement the defendant gave to the police in the current matter, stating:

> And his statement about the other homicide, which was committed with the same weapon, which was just a short time prior to that, would indicate not only is he a dangerous offender but the aggregate term must relate to the severity of the offenses. There's two homicides. It's necessary to protect the public from further serious criminal conduct by the defendant. I think the [*State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995)] factors apply. Clearly two homicides in a short period of time involving execution-style

matters would indicate we need to keep [the defendant] incarcerated as long as possible to protect the public from further serious criminal conduct by the defendant.

*Id*.

The same trial judge subsequently presided over the current matter, so the defendant moved for recusal. The trial court denied the motion, and the defendant filed an expedited appeal in which he argued the statements made by the trial judge during sentencing indicated he could not be fair and impartial in the present matter. After considering the applicable law, this Court concluded:

> The fact that the trial court presided over the [defendant's] first case, which may share some similarities with the instant case and may even involve some of the same evidence, is not a basis for recusal. *See* [*State v.*] *Reid*, 213 S.W.3d [792,] 815 [(Tenn. 2006)]. Indeed, the trial court's knowledge of the facts of a case does not require disqualification. *See id*. The [defendant] has not shown a reasonable basis for questioning the trial court's impartiality based upon the fact that it presided over the [defendant's] previous trial.

> The main reason the [defendant] argues the trial court should recuse itself, having already presided over the [defendant's] first trial, is because of certain comments the court made in the previous case which, according to the [defendant], suggest it has already prejudged the [defendant's] guilt in the instant case.

> . . .

> Having reviewed the parts of the trial record included in the instant petition, and considering the [defendant's] argument in light of the trial court's order, this Court does not believe a reasonable person would construe the trial court's comments, when viewed in the context they were made, as a prejudgment of the of the [defendant's] guilt in this case. As the trial court recognized, the comments were limited to the specific tasks it was required to perform. They were not so pervasive that they will deny the [defendant] a fair trial in this case. *Id*. at 821. Instead, the trial court's comments "were designed to expedite the litigation" in the previous case and they do not establish that it has formed an opinion in this case. *Reid*, 213 S.W.3d at 816.

In his recusal motion, the defendant further alleged an emotional and profane outburst made by the defendant during sentencing brought the trial court's ability to be impartial in the trial of the present matter into question. When affirming the trial court's denial of the defendant's motion to recuse on this basis, this Court concluded:

> The [defendant] argues that recusal is also warranted because a person of ordinary prudence, knowing that the [defendant] has already made extremely profane comments toward the trial court, would find a reasonable basis for at least questioning the trial court's impartiality toward the [defendant]. Again, this Court disagrees. The trial court offered a well-reasoned explanation for declining to recuse itself on this ground: "most reasonable people would anticipate that criminal court judges will encounter occasional outbursts from defendants and will address such actions appropriately without harboring any animosity toward the defendant." The portions of the transcript of the hearings provided to this Court do not reveal any reciprocating hostility by the trial court toward the [defendant]. Instead, the trial court acted with proper decorum, and there is absolutely nothing before this Court which demonstrates anything remotely indicative of a personal bias the trial court harbors toward the [defendant] based upon his outbursts.

*Id*. at *7.

This Court's prior conclusions of law as to the propriety of the trial court's denial of the defendant's motion to recuse have become the law of this case. The defendant has not alleged one of the exceptions to the law of the case doctrine applies, and based on our review of the record, none do. The defendant is not entitled to relief on this issue.

## III.   Admission of Photographic Evidence

### A.   Photograph of Gunshot Wounds

The defendant next asserts the trial court erred when admitting Exhibit 1G, an up-close photograph of the victim lying face down with multiple gunshot wounds to his face and shoulder area, arguing the danger of unfair prejudice to the defendant outweighed the photograph's probative value. The State contends the photograph was the only picture of the defendant's injuries introduced at trial, helped explain the medical proof, supported the State's theory, and corroborated the defendant's confession to the police, so it had significant probative value. Moreover, its relative lack of gore did not create a risk of prejudice that substantially outweighed its probative value. We agree with the State.

Decisions as to the admissibility of photographic evidence lie within the sound discretion of the trial court, and this Court will only reverse such decisions upon a finding the trial court abused that discretion. *State v. Willis*, 496 S.W.3d 653, 726 (Tenn. 2016). When deciding whether a photograph is admissible, the trial court must first determine whether the evidence is relevant, meaning it has a "'tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Id*. (quoting Tenn. R. Evid. 401). The trial court must then weigh its probative value against any unfair prejudice the evidence may cause and exclude it if "'its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Id*. (quoting Tenn. R. Evid. 403). Unfairly prejudicial evidence has "'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Id*. (quoting Tenn. R. Evid. 403, Advisory Comm. Cmts.).

Prior to trial, the defendant challenged the admission of various photographs of the victim, including the photograph later marked at trial as Exhibit 1G, which the trial court described as:

> An up-close photograph of the left side of [the victim's] body between the left eye and the left armpit. The five gunshot wounds are visible; some blood protrudes from each of the wounds, and what the [S]tate asserts is stippling is visible. A ruler is held in the photograph to provide scale, and a relatively small amount of pooled blood is visible on a section of bedsheets between [the victim's] left arm, chin, and left shoulder.

After reviewing the above-described photograph, the trial court found it would be admissible at trial if properly authenticated. The image was "relevant to depicting the number of wounds inflicted and the manner and location in which they were inflicted, which in turn [wa]s relevant to establishing that the wounds were inflicted in an intentional and premeditated manner." The trial court noted photographic evidence would not be cumulative because it was the only photograph depicting the victim's fatal injuries that would be introduced at trial. Moreover, while blood could be seen around the gunshot wounds, the photograph was not "unduly gruesome," so its probative value was not outweighed by its potential for unfair prejudice.

Here, the trial court properly exercised its discretion when admitting Exhibit 1G. After finding the image of the gunshot wounds was relevant to the victim's manner of death, the trial court noted the blood shown in the photograph was not so "unduly gruesome" as to make it unfairly prejudicial. It is well-established that photographs of victims "are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." *State v. Banks*, 564 S.W.2d

947, 950-51 (Tenn. 1978). We see no reason to depart from this clear precedent. Furthermore, the photograph at issue was far from gruesome and horrifying. It instead illustrated all five gunshot wounds and aligned two of the five wounds with a ruler to depict size. The photograph was taken at the crime scene and contained some blood, but given the circumstances surrounding the victim's death, was properly characterized by the trial court as "not unduly gruesome." The defendant is not entitled to relief on this basis.

### B. Photograph of Gun Being Fired

The defendant next asserts the trial court erred when admitting a photograph of a gun being fired because its probative value was outweighed by its "inflammatory effect." In response, the State contends the photograph was demonstrative evidence that aided the jury in understanding the testimony of the State's experts and corroborated the defendant's confession, and the defendant failed to show how he was prejudiced by the photograph. We agree with the State.

At the outset, we note the defendant waived his right to appeal this issue by failing to make a timely objection to the admission of the photograph at trial. *See* Tenn. R. Evid. 103 (stating, "[e]rror may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection"); *see also State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (when the defendant fails to make a contemporaneous objection to the admission of evidence, waiver applies). Based on our review of the record, the defendant failed to file a motion to strike the photograph and did not object at trial to the admission of the photograph as demonstrative evidence, so the issue has been waived.

Notwithstanding waiver, the defendant has not shown the trial court abused its discretion when admitting the photograph into evidence. The admission of demonstrative evidence also lies within the discretion of the trial court. *State v. Christopher Swift*, No. W2013-00842-CCA-R3-CD, 2015 WL 2128782, *14 (Tenn. Crim. App. May 5, 2015) *perm. app. denied* (Tenn. Oct. 24, 2016). To be admissible, generally the demonstrative evidence must be relevant, and its probative value cannot be "'substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'" *Id*. (quoting Tenn. R. Evid. 403).

Here, the photograph was admitted as Exhibit 21 through Agent Brodhag, who testified as an expert in firearms identification and opined the bullets collected from the scene and the victim had been fired from the revolver seized from the defendant's

girlfriend's vehicle. When testifying at trial, Agent Brodhag offered this explanation for the image:

> Q. I'm going to show you another picture and ask if you recognize it. . . . What are we looking at here?
>
> A. That's a photograph of a revolver being fired. You can see – of course, the bullet is going out the barrel, but you also get a lot of partially burnt powder and burned powder and unburned powder as well coming out of the muzzle in addition to a cloud of vaporous lead.
>
> Q. And can you tell us a little bit about – the gases and everything that's coming out, would we ever see that manifested on an item?
>
> A. You might see it on an item of clothing if someone was shot, for example, at [a] close range[]. You wouldn't see it at thirty feet away, but at close ranges you might.

Later during the trial, Agent Betts, a forensic scientist with the TBI who analyzed a pillow taken from the crime scene for gunshot residue, also testified as an expert in the field of firearms identification. Agent Betts explained that as part of her investigatory process, she conducted microscopic and chemical analyses on the pillow and opined that "[r]esidues and characteristics were found on the solid side of the pillow which [were] consistent with those produced when a firearm is discharged while in contact, or near contact with an object," and "[r]esidues were found on the printed side of the pillow which [were] consistent with the passage of a projectile." Agent Betts could not determine whether the holes in the pillow were the result of one or two gunshots but concluded the gun was a quarter of an inch to half of an inch from the pillow at the time it was fired. Using the photograph of the gun being fired to aid in her explanation of the marks she found on the pillow, Agent Betts engaged in the following exchange with the prosecutor:

> Q. And before we move on, I'm going to show you what's previously been marked as Exhibit Number 21 on the screen. Can we see maybe what caused some of those markings or can you use this to further explain to the jurors what you just told them?
>
> A. I can. This is the muzzle end of the firearm when it's fired. And this is a revolver with about maybe a three inch barrel, two or three inch barrel, I'm just guessing. But the majority of the residues that are coming out from this area this way (indicating), those bright lights that are going

off like flares, that's probably gun powder particles that are leaving or molted metal of some type. It might be lead shavings from the inside of the barrel. This area that's around here is from – that's what we call lead vapor, soot, or smoke (indicating). That's the product of combustion. It's a smoke cloud that comes out. This area back here and also that you can see right here (indicating) looks to me like – this is the end of the cylinder that I talked about. This is where the cylinder gap residues would come out. So they're coming out in this area and also from the other side of the gun over in this area (indicating). That's the area that causes the burns and this blackening at these two locations, and this is the end of the gun, the muzzle, where all of this is coming out of.

The photograph at issue was relevant to Agent Brodhag's opinion the revolver found in the defendant's girlfriend's car was the same used to shoot the bullets found in the victim and at the scene. It was also relevant to Agent Betts' opinions as to why she found gunshot residue on the pillow. The defendant failed to specify the prejudicial effect this photograph had on his case, and we see none. The defendant is not entitled to relief on this issue.

## V. Evidence of the Pawning of Items by the Victim's Girlfriend

The defendant next argues the trial court erred when allowing the State to present evidence that the victim's girlfriend continued to pawn items in the months following the victim's murder because it was irrelevant. The State contends the evidence was relevant because it corroborated the defendant's statement and supported the State's theory the victim's girlfriend hired the defendant to murder the victim and continued to owe the defendant money following the shooting. We agree with the State.

Rulings regarding the relevancy of evidence are "within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." *State v. Biggs,* 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing *State v. DuBose,* 953 S.W.2d 649, 652 (Tenn. 1997)). Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. This standard is a lenient one and merely requires the proffered evidence "tend to prove a material issue." Tenn. R. Evid. 401, Advisory Comm. Cmts.

At trial, the State sought to call Mr. Wind, the owner of Hy's Pawn Shop, Inc., and Ms. Johnson, a former employee of Cash America Pawn of Nashville, to testify regarding items pawned by the victim's girlfriend on November 9, 2009, December 11, 2009, and January 12, 2010, to corroborate the defendant's confession that the victim's girlfriend

offered to pay him $1000.00 to kill the victim. The defendant objected to their testimonies on ground of relevancy. According to the defendant's statement, the victim's girlfriend paid him less than their agreed upon price on October 14, 2009. Sometime later, the victim's girlfriend gave the defendant speakers that would not fit into his car, so he pawned them for approximately $100.00. Based on the information provided by the defendant in his statement, the trial court found the proposed testimony relevant and allowed the witnesses to testify.

Ms. Johnson testified that she was working at Cash America Pawn November 9, 2009, and December 11, 2009. The victim's girlfriend came in both dates. On November 9, 2009, the victim's girlfriend brought in two rings and received $27.00 in cash for both. When the victim's girlfriend returned on December 11, 2009, she brought in a black toaster and received a $20.00 loan. Mr. Wind testified that the victim's girlfriend brought a ring into his pawnshop on January 12, 2010, and he bought it outright for $52.00. The State did not present any evidence that this money was actually given to the defendant.

Given the defendant's admission that the victim's girlfriend agreed to pay him to kill the victim, failed to pay him the entire agreed upon amount at the time of the shooting, and subsequently gave him speakers that the defendant was able to pawn for cash, the trial court properly allowed the State to present the challenged evidence. While not overwhelming, the testimony rendered by Mr. Wind and Ms. Johnson and the paperwork documenting the transactions had a tendency to show the victim's girlfriend was in need of cash to finish paying the defendant for killing the victim. The trial court did not abuse its discretion when finding this evidence to be relevant, and the defendant did not challenge its admission on any other grounds. The defendant is not entitled to relief on this issue.

## VI.    Jury Instructions

The defendant further asserts the trial court erred when instructing the jury that "[l]aw enforcement is allowed to use deceptive practices when interviewing individuals." The State contends the defendant waived this issue by failing to cite any supporting law in his brief, and despite waiver, it was a legally accurate instruction given by the trial court as part of a larger statement. We agree the defendant has not properly briefed this issue, so we decline to address it on appeal.

Every appellant's brief must include an argument setting forth:

(A) [T]he contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require

- 15 -

appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on; and

(B) for each issue, a concise statement of the applicable standard of review (which may appear in the discussion of the issue or under a separate heading placed before the discussion of the issues)[.]

Tenn. R. App. P. 27(a)(7). "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this [C]ourt." Tenn. Ct. Crim. App. R. 10(b). In support of his contention the trial court erroneously instructed the jury regarding the use of deceptive practices by law enforcement, the defendant's brief contains a single sentence stating, "This instruction violated [the defendant's] due process rights under the Fifth Amendment to the United States Constitution as it unfairly rehabilitated the credibility of the law enforcement officer who interviewed [the defendant]." The defendant failed to cite any law in support of his argument, and such conclusory arguments fail to meet basic briefing requirements. The defendant waived his argument regarding the propriety of the trial court's jury instructions by failing to properly brief the issue. *See State v. Killebrew*, 760 S.W.2d 228, 231-32 (Tenn. Ct. App. 1988) (issues not supported by argument, citations to authority, and references to the record are waived and will not be considered on appeal). The defendant is not entitled to relief on this issue either.

## VII.   Imposition of Consecutive Sentences

Finally, the defendant challenges the trial court's decision to run his sentence of life imprisonment in this case consecutive to his effective sentence of life imprisonment plus twenty-five years imposed in Davidson County Case Number 2010-C-1912. The defendant asserts the trial court may only impose consecutive sentences after finding the period of confinement is necessary to protect the public from further criminal conduct by the defendant. The defendant, however, failed to include the transcript from the sentencing hearing with the record submitted to this Court on appeal, so he has waived this issue.

The defendant had a duty to have all parts of the transcript prepared which were "necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). This Court is precluded from reviewing an issue when the appellant submits an incomplete record that does not contain a transcript from the proceedings relevant to the issue presented for review. *State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988). Without the transcript from the sentencing hearing, we do not know what findings the trial court made

prior to running the defendant's life sentence consecutive to the sentence he was already serving in Case Number 2010-C-1912. The defendant is not entitled to relief.

### *Conclusion*

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
J. ROSS DYER, JUDGE